SOUTH-CENTRAL TIMBER DEVELOPMENT, INC., Plaintiff,

v.

Robert LeRESCHE, Commissioner of Department of Natural Resources of the State of Alaska; Geoffrey Haynes, Director, Division of Natural Resources, and Deputy Commissioner of Department of Natural Resources of the State of Alaska; and Theodore G. Smith, Director of Division of Forest, Land and Water Management, of Department of Natural Resources of the State of Alaska, Defendants,

Kenai Lumber Company, Intervenor.

Civ. No. A80–311.

United States District Court, D. Alaska.

Jan. 5, 1981.

**140**

'LeRoy E. DeVeaux, Wanamaker, De-Veaux & Crabtree, Anchorage, Alaska, for plaintiff.

Shelley J. Higgins, Asst. Atty. Gen., State of Alaska Dept. of Law, Mark L. Figura, Burr, Pease & Kurtz, Anchorage, Alaska, for defendants.

## MEMORANDUM AND ORDER

VON DER HEYDT, Chief Judge.

THIS CAUSE comes before the court on cross motions by plaintiff and defendant for summary judgment, and defendant-intervenor's motion to dismiss. The parties agree that the sole issue to be decided is whether the State's requirement of primary manufacture violates the Commerce Clause of the United States Constitution.[1] As the matter in controversy exceeds the sum of $10,000, this court has jurisdiction pursuant to 28 U.S.C. § 1331(a).

### I. FACTS

In September, 1980, the State of Alaska gave notice that it would sell approximately 49,185,000 board feet of timber in the area of Icy Cape, Alaska, on October 23, 1980. The notice of the sale provided, pursuant to 11 A.A.C. § 76.130,[2] that "primary manufacture within the State of Alaska will be required as a special provision of the contract." The inclusion of the primary manufacture requirement in the timber sales contract requires a successful bidder to pre-cut the sale timber in Alaska prior to export.

---

1. U.S.Const., art. I, § 8 provides in relevant part: "The Congress shall have Power ... To regulate Commerce with foreign nations, and among the several states...."

2. 11 A.A.C. § 76.130 (1974) provides:

PRIMARY MANUFACTURE

(a) The director may require that primary manufacture of logs, cordwood, bolts or other similar products be accomplished within the State of Alaska.

(b) The term primary manufacture means manufacture which is first in order of time or development. When used in relation to sawmilling, it means

(1) the breakdown process wherein logs have been reduced in size by a headsaw or gang saw to the extent that the residual cants, slabs or planks can be processed by resaw equipment of the type customarily used in log processing plants; or

(2) manufacture of a product for use without further processing, such as structural timbers (subject to a firm showing of an order or orders for this form or product).

(c) Primary manufacture, when used in reference to pulp ventures, means the breakdown process to a point where the wood fibers have been separated. Chips made from timber processing wastes shall be considered to have received primary manufacture. With respect to veneer or plywood production, it means the production of green veneer. Poles and piling, whether treated or untreated, when manufactured to American National Institute Standards specifications are considered to have received primary manufacture.

Authority: AS 38.05.020
AS 38.05.110
AS 38.05.115
AS 38.05.120

Plaintiff South-Central Timber Development, Inc. (South-Central) is an Alaskan corporation engaged in the business of purchasing Alaska standing timber, logging such timber, and shipping the resulting logs into foreign commerce. Although South-Central desires to bid on the Icy Cape No. 2 timber sale, it is hampered by its lack of a working mill in Alaska. South-Central must take into account the added costs of having primary manufacture performed instate. This added cost effectively precludes South-Central from bidding on the timber.

## II. *THE COMMERCE CLAUSE AND PRIMARY MANUFACTURE*

The State and intervenor contend that the primary manufacture requirement is permissible under the commerce clause for two reasons: 1) Alaska's policy of requiring primary manufacture as a term of a state timber contract is consistent with federal policy as expressed by Congress; and, 2) by including primary manufacture as a term in the state timber contract, the state is not regulating interstate commerce; rather it is acting in a proprietary capacity as a market participant and is therefore exempt from commerce clause requirements.

### A. *FEDERAL POLICY OF PRIMARY MANUFACTURE*

It is clear that if Congress had consented to the State's primary manufacture requirement, any commerce clause restrictions would be waived. *E. g. Southern Pacific Co. v. Arizona*, 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945). To determine whether Congress has consented to the requirement, the court must examine the relevant Congressional provisions in this area.

The State points out that the federal government historically has placed restrictions on the export of unprocessed logs from federal lands in the western states, including federal lands in Alaska. Since 1928, the United States Forest Service has restricted the export of unprocessed timber from national forest timber sales in Alaska under the general authority granted by Congress. 16 U.S.C. § 471 *et seq.* (1976) (National Forests).

Section 475 provides in part that one of the purposes for establishing a national forest is "to furnish a continuous supply of timber for use and necessities of the citizens of the United States...." Section 551 allows the Secretary of Agriculture, under the provisions of § 471, to make necessary "rules and regulations and establish such service ... to regulate ... and to preserve the forests...." Regulations currently in effect restrict the export, in unprocessed form, of timber harvested from sales in national forest land in Alaska. 36 C.F.R. § 223.10(i).[3]

An examination of the relevant statutory provisions shows that Congress has not consented to any primary manufacture requirements imposed by the states. When Congress has exempted state laws from commerce clause restrictions, it has used language specifically directing that certain interstate commerce may be regulated as though it were purely local. *See* the Wilson Act, 27 U.S.C. § 121 (1976); *see also* the

---

**3.** 36 C.F.R. § 223.10(i) (1977) provides:

Subject to the other provisions of this section, timber cut from the National Forests in the State of Alaska may not be exported from Alaska in the form of logs, cordwood, bolts, or other similar products necessitating primary manufacture elsewhere without prior consent of the Regional Forester. This requirement is determined to be necessary in order to assure the development and continued existence of adequate wood processing capacity in that State essential to the sustained utilization of timber from the National Forests located therein which is geographically isolated from other processing capacity. In determining whether consent will be given to the export of such timber, consideration will be given, among other things, to whether such export will (1) permit a more complete utilization of material on areas being logged primarily for products for local manufacture, (2) prevent loss or serious deterioration of logs unsalable locally because of an unforeseen loss of market, (3) permit the salvage of timber, damaged by wind, insects, or fire, (4) bring into use a minor species of little importance to local industrial development, or (5) provide material required to meet urgent and unusual needs of the Nation.

McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.* (1976) ("silence . . . of Congress shall not be construed to impose any barrier to . . . regulation . . . by the several states.").

Although Congress has authorized the Secretary of Agriculture to make necessary rules to regulate the national forests, and has imposed export quotas on unprocessed timber from federal lands, it has in no way expressly exempted state timber laws from commerce clause restrictions. Given Congress' silence, a negative is presumed to bar state action inimical to the national commerce, and in such cases the Supreme Court is "the final arbiter of the competing demands of state and national interests." *South Pacific Co. v. Arizona*, 325 U.S. at 769, 65 S.Ct. at 1520.

### B. *THE STATE AS A PROPRIETOR*

The State maintains that it is acting in a proprietary capacity (as the timber subject to the primary manufacture requirement is state owned) and is therefore unrestricted by the commerce clause. *Reeves v. Stake*, 477 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). The Supreme Court has made clear, however, that "[a]ll objects of interstate trade merit Commerce Clause protection; none is excluded by definition at the outset." *Philadelphia v. New Jersey*, 437 U.S. 617, 622, 98 S.Ct. 2531, 2534, 57 L.Ed.2d 475 (1978). The court must determine whether *Alexandria Scrap* and *Reeves* allow the State to require primary manufacture of state-owned timber within Alaska as a condition of sale.

### 1. *ALEXANDRIA SCRAP AND REEVES*

In *Alexandria Scrap*, the Court upheld a Maryland statute which promoted the disposal of abandoned automobiles through cash payments to scrap processors. Even though the payments favored in-state processors, the Court found no commerce clause problems. Relying on the fact that Maryland was acting in a proprietary capacity,

the Court held that "[n]othing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." 426 U.S. at 810, 96 S.Ct. at 2498.

In *Reeves*, the Court ruled that the commerce clause did not prohibit South Dakota from refusing to sell cement from a state owned and operated cement plant to out-of-state customers, pursuant to its policy of supplying South Dakota customers first. The Court noted that "[t]he basic distinction drawn in *Alexandria Scrap* between States as market participants and States as market regulators makes good sense and sound law." 477 U.S. at 436, 100 S.Ct. at 2277, 65 L.Ed.2d 244.

The *Reeves* Court termed the holding in *Alexandria Scrap* the "general rule" as to states acting in a proprietary manner. 477 U.S. at 440, 100 S.Ct. at 2279, 65 L.Ed.2d 244. The Court went on to concede the possibility of an exception, but reasoned: "in this case [there is] no sufficient reason to depart from the general rule." *Id.* Later, the Court addressed the possible limits to the *Alexandria Scrap* exemption when it considered the argument that if a state were allowed to hoard its resources "Pennsylvania might keep its coal, the northwest its timber, [and] the mining States their minerals." *West v. Kansas Nat. Gas Co.*, 221 U.S. 229, 255, 31 S.Ct. 564, 571, 55 L.Ed. 716 (1911). The Court distinguished cement from natural resources such as coal, timber, wild game, and minerals, and noted that "South Dakota has not sought to limit access to the State's limestone or other materials used to make cement." 447 U.S. at 444, 100 S.Ct. at 2281, 65 L.Ed.2d 244.

■ Here the State is restricting the flow of a state-owned natural resource rather than a state-owned man-made commodity. Timber is not a commodity which, when needed, is capable of being readily produced by any state at any time. Conversely, a state may enter the cement business, with little problem, in order to supply its region with needed cement. The

uniqueness of a natural resource, the happenstance of its location, and the resulting national need for its unrestricted flow prevent a state from economically discriminating in favor of its residents simply because a resource lies on state-owned land.

The court finds that the State's primary manufacture requirement goes beyond the *Alexandria Scrap* exemption, as a natural resource is involved. The *Alexandria Scrap* general rule is not a magic talisman which allows a state to place unconstitutional restrictions on a resource if it is state-owned. While the fact that a state owns a natural resource may allow it to favor its residents in the distribution of the resource in certain ways, a state may not "attach conditions to the use or disposition of the resource that might independently burden interstate commerce. . . ." Hellerstein, *Hughes v. Oklahoma: The Court, The Commerce Clause, And State Control Of Natural Resources*, 1979 Sup.Ct.Rev. 51, 71 (1980).

Since the court has determined that the primary manufacture requirement goes beyond the *Alexandria Scrap* exemption, it must determine whether this requirement unconstitutionally burdens commerce.

### 2. THE PIKE TEST

■ The Supreme Court has set forth the criteria for determining the validity of state actions affecting interstate commerce. The rule that emerges is that:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (citations omitted).

■ Under this test, the primary manufacture requirement is unconstitutional. The requirement does not regulate evenhandedly, as it does not fall evenly on companies with in-state timber mills and companies with out-of-state timber mills; the requirement precludes South-Central from competing on equal footing with companies that possess in-state mills capable of performing primary manufacture.

Additionally, the public interest served goes beyond the Court's sanction of permissible commerce clause burdens. *See e. g. Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 524, 79 S.Ct. 962, 964, 3 L.Ed.2d 1003 (1959) (state regulation furthering public safety, but burdening commerce held permissible). Here the purpose served is economic—"to protect existing industries, provide for the establishment of new industries, [and] derive revenue from all timber resources. . . ." Governor's Office News Release (June 30, 1961) (Governor Egan's policy statement on primary manufacture).

Through the years, the Supreme Court has been alert to the evils of economic protectionism. The Court frequently has indicated that the purpose of the commerce clause was to avoid "the tendencies toward economic Balkanization that had plagued relations among the colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979). "Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." *Philadelphia v. New Jersey*, 437 U.S. at 624, 98 S.Ct. at 2535.

Turning to the "burden" side of the *Pike* test, the primary manufacture requirement places a substantial rather than an incidental burden on commerce. The application of the primary manufacture requirement would, at the least, require companies without mills in Alaska to lease mill facilities within the state capable of performing the requirement. Indeed, the "Court has viewed with particular suspicion state statutes requiring business operations to be per-

**144**

formed in the home State that could more efficiently be performed elsewhere. Even where the State is pursuing a clearly legitimate local interest, this particular burden on commerce has been declared to be virtually *per se* illegal." *Pike*, 397 U.S. at 145, 90 S.Ct. at 849.

Finally, the court finds that less burdensome means are available to the State to achieve the same end. For example, the state may implement a statutory scheme which encourages in-state processing rather than action which bars out-of-state processing. This is, however, a legislative question; the court simply notes other schemes are available.

Accordingly, IT IS ORDERED:

1) THAT plaintiff's motion for summary judgment is granted.

2) THAT defendant's motion for summary judgment is denied and intervenor's motion to dismiss is denied.

3) THAT the clerk may prepare a final judgment form stating that the named defendants or any official of the State of Alaska are permanently enjoined from requiring primary manufacture of state-owned timber pursuant to 11 A.A.C. § 76.-130, as the requirement of primary manufacture violates art. I, § 8 of the United States Constitution.