SOUTH-CENTRAL TIMBER DEVELOPMENT, INC. *v.*
WUNNICKE, COMMISSIONER, DEPARTMENT OF
NATURAL RESOURCES OF ALASKA, ET AL.

No. 82–1608.   Argued February 29, 1984—Decided May 22, 1984

*LeRoy E. DeVeaux* argued the cause for petitioner. With him on the briefs were *Richard L. Crabtree, Donald I. Baker, Karen L. Grimm,* and *Erwin N. Griswold.*

*Kathryn A. Oberly* argued the cause for the United States as *amicus curiae* in support of petitioner. With her on the brief were *Solicitor General Lee, Assistant Attorney General Habicht, Deputy Solicitor General Claiborne,* and *Dirk D. Snel.*

*Ronald W. Lorensen,* Deputy Attorney General of Alaska, argued the cause for respondents. On the brief were *Norman C. Gorsuch,* Attorney General, and *Michael J. Frank* and *Michele D. Brown,* Assistant Attorneys General.*

JUSTICE WHITE announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, and an opinion with respect to Parts III and IV, in which JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE STEVENS joined.

---

*James H. Clarke* filed a brief for the Pacific Rim Trade Association et al. as *amici curiae* urging reversal.

*C. Dean Little* filed a brief for Northwest Independent Forest Manufacturers et al. as *amici curiae* urging affirmance.

We granted certiorari in this case to review a decision of the Court of Appeals for the Ninth Circuit that held that Alaska's requirement that timber taken from state lands be processed within the State prior to export was "implicitly authorized" by Congress and therefore does not violate the Commerce Clause. 464 U. S. 890 (1983). We hold that it was not authorized and reverse the judgment of the Court of Appeals.

I

In September 1980, the Alaska Department of Natural Resources published a notice that it would sell approximately 49 million board-feet of timber in the area of Icy Cape, Alaska, on October 23, 1980. The notice of sale, the prospectus, and the proposed contract for the sale all provided, pursuant to 11 Alaska Admin. Code § 76.130 (1974), that "[p]rimary manufacture within the State of Alaska will be required as a special provision of the contract."[1] App. 35a. Under the primary-manufacture requirement, the successful bidder must partially process the timber prior to shipping it outside of the State.[2] The requirement is imposed by contract and

---

[1] The proposed contract, which the successful bidder on the timber sale would have been required to sign, provided:

"*Section 68. Primary Manufacture.* Timber cut under this contract shall not be transported for primary manufacture outside the State of Alaska without written approval of the State.

"Primary Manufacture is defined under 11 AAC 76.130 and the Governor's policy statement of May 1974."

[2] 11 Alaska Admin. Code § 76.130 (1974) (repealed 1982), which authorized the contractual provision in question, provided:

"PRIMARY MANUFACTURE

"(a) The director may require that primary manufacture of logs, cordwood, bolts or other similar products be accomplished within the State of Alaska.

"(b) The term primary manufacture means manufacture which is first in order of time or development. When used in relation to sawmilling, it means

"(1) the breakdown process wherein logs have been reduced in size by a headsaw or gang saw to the extent that the residual cants, slabs, or planks

does not limit the export of unprocessed timber not owned by the State. The stated purpose of the requirement is to "protect existing industries, provide for the establishment of new industries, derive revenue from all timber resources, and manage the State's forests on a sustained yield basis." Governor's Policy Statement, App. 28a. When it imposes the requirement, the State charges a significantly lower price for the timber than it otherwise would. Brief for Respondents 6–7.

The major method of complying with the primary-manufacture requirement is to convert the logs into *cants*, which are logs slabbed on at least one side. In order to satisfy the Alaska requirement, cants must be either sawed to a maximum thickness of 12 inches or squared on four sides along their entire length.[3]

Petitioner, South-Central Timber Development, Inc., is an Alaska corporation engaged in the business of purchasing standing timber, logging the timber, and shipping the logs into foreign commerce, almost exclusively to Japan.[4] It

---

can be processed by resaw equipment of the type customarily used in log processing plants; or

"(2) manufacture of a product for use without further processing, such as structural timbers (subject to a firm showing of an order or orders for this form of product).

"(c) Primary manufacture, when used in reference to pulp ventures, means the breakdown process to a point where the wood fibers have been separated. Chips made from timber processing wastes shall be considered to have received primary manufacture. With respect to veneer or plywood production, it means the production of green veneer. Poles and piling, whether treated or untreated, when manufactured to American National Institute Standards specifications are considered to have received primary manufacture."

The local-processing requirement is now authorized by Alaska Admin. Code §§ 71.230, 71.910 (1982).

[3] Current regulations require that the cants be no thicker than 8¾ inches unless slabs are taken from all four sides. 11 Alaska Admin. Code § 71.910 (1982).

[4] Apparently, there is virtually no interstate market in Alaska timber because of the high shipping costs associated with shipment between

does not operate a mill in Alaska and customarily sells unprocessed logs. When it learned that the primary-manufacture requirement was to be imposed on the Icy Cape sale, it brought an action in Federal District Court seeking an injunction, arguing that the requirement violated the negative implications of the Commerce Clause.[5] The District Court

American ports. Consequently, over 90% of Alaska timber is exported to Japan. Brief for Petitioner 14, n. 14.

[5] Although it would appear at first blush that it would be economically more efficient to have the primary processing take place within Alaska, that is apparently not the case. Material appearing in the record suggests that the slabs removed from the log in the process of making cants are often quite valuable, but apparently cannot be used and are burned. Record, Exh. 11, p. 63. It appears that because of the wasted wood, cants are actually worth *less* than the unprocessed logs. An affidavit of a vice president of South-Central states in part:

"5. It is also my observation that within Alaska there is absolutely no market for domestic resawing of 'cant' or 'square' manufactured to State of Alaska specifications. In other words, a cant or square manufactured in Alaska would be virtually unsaleable within local Alaska sawmill markets. The reasons are:

"A. Any sawmill would prefer round logs for its sawmill operations and the small volume of round logs required would be readily available locally.

"B. Round logs are preferable because they can be stored in the water and moved in the water, whereas cants must be transported on land.

"C. Once a log is placed on the sawmill carriage and the costs of getting it there have been incurred, it produces more lumber for the costs involved than does a cant.

"D. Also the round log is much less subject to deterioration from weather and outside conditions.

"6. South-Central had experience with attempting to make a sale of cants inside the State of Alaska. We had some cants at Jakalof Bay which were manufactured to State specifications, but which were not loaded aboard ships during that season. We attempted to market those cants to a sawmill in Anchorage, but found that just costs of transporting the cants from Jakalof Bay to Anchorage exceeded the highest possible sales price of the cants. Accordingly no sale was made.

"7. Based on the above statements and my observations of the Alaska timber industry, it is my firm conclusion that a cant or a square manufactured to State of Alaska primary manufacture specifications is marketable

agreed and issued an injunction. *South-Central Timber Development, Inc.* v. *LeResche*, 511 F. Supp. 139 (Alaska 1981). The Court of Appeals for the Ninth Circuit reversed, finding it unnecessary to reach the question whether, standing alone, the requirement would violate the Commerce Clause, because it found implicit congressional authorization in the federal policy of imposing a primary-manufacture requirement on timber taken from federal land in Alaska. *South-Central Timber Development, Inc.* v. *LeResche*, 693 F. 2d 890 (1982).

We must first decide whether the court was correct in concluding that Congress has authorized the challenged requirement. If Congress has not, we must respond to respondents' submission that we should affirm the judgment on two grounds not reached by the Court of Appeals: (1) whether in the absence of congressional approval Alaska's requirement is permissible because Alaska is acting as a market participant, rather than as a market regulator; and (2), if not, whether the local-processing requirement is forbidden by the Commerce Clause.

## II

Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce. See *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S. 27, 35 (1980); *Hughes* v. *Oklahoma*, 441 U. S. 322, 326 (1979); *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 534–538 (1949); *Cooley* v. *Board of Wardens*, 12 How. 299 (1852). It is equally clear that Congress may "redefine the distribution of power over interstate commerce" by "permit[ting] the

---

only in foreign commerce and cannot be sold for use within Alaska. It is also my firm conclusion that no sawmill in Alaska will manufacture a cant or square for any domestic Alaska market." App. 121a–122a.

states to regulate the commerce in a manner which would otherwise not be permissible." *Southern Pacific Co.* v. *Arizona*, 325 U. S. 761, 769 (1945). See also *Sporhase* v. *Nebraska ex rel. Douglas*, 458 U. S. 941, 958–960 (1982); *New England Power Co.* v. *New Hampshire*, 455 U. S. 331 (1982); *Western & Southern Life Insurance Co.* v. *State Board of Equalization*, 451 U. S. 648, 652–655 (1981); *Prudential Insurance Co.* v. *Benjamin*, 328 U. S. 408 (1946). The Court of Appeals held that Congress had done just that by consistently endorsing primary-manufacture requirements on timber taken from *federal* land. 693 F. 2d, at 893. Although the court recognized that cases of this Court have spoken in terms of *express* approval by Congress, it stated:

> "But such express authorization is not always necessary. There will be instances, like the case before us, where federal policy is so clearly delineated that a state may enact a parallel policy without explicit congressional approval, even if the purpose and effect of the state law is to favor local interests." *Ibid.*

We agree that federal policy with respect to federal land is "clearly delineated," but the Court of Appeals was incorrect in concluding either that there is a clearly delineated federal policy approving Alaska's local-processing requirement or that Alaska's policy with respect to its timber lands is authorized by the existence of a "parallel" federal policy with respect to federal lands.

Since 1928, the Secretary of Agriculture has restricted the export of unprocessed timber cut from National Forest lands in Alaska. The current regulation, upon which the State places heavy reliance, provides:

> "Unprocessed timber from National Forest System lands in Alaska may not be exported from the United States or shipped to other States without prior approval of the Regional Forester. This requirement is neces-

sary to ensure the development and continued existence of adequate wood processing capacity in that State for the sustained utilization of timber from the National Forests which are geographically isolated from other processing facilities." 36 CFR § 223.10(c) (1983).

From 1969 to 1973, Congress imposed a maximum export limitation of 350 million board-feet of unprocessed timber from federal lands lying west of the 100th meridian (a line running from central North Dakota through central Texas). 16 U. S. C. § 617(a). Beginning in 1973, Congress imposed, by way of a series of annual riders to appropriation Acts, a complete ban on foreign exports of unprocessed logs from western lands except those within Alaska. See, *e. g.*, Pub. L. 96–126, Tit. III, § 301, 93 Stat. 979. These riders limit only foreign exports and do not require in-state processing before the timber may be sold in domestic interstate commerce. The export limitation with respect to federal land in Alaska, rather than being imposed by statute, was imposed by the above-quoted regulation, and applies to exports to other States, as well as to foreign exports.

Alaska argues that federal statutes and regulations demonstrate an affirmative expression of approval of its primary-manufacture requirement for three reasons: (1) federal timber export policy has, since 1928, treated federal timber land in Alaska differently from that in other States; (2) the Federal Government has specifically tailored its policies to ensure development of wood-processing capacity for utilization of timber from the National Forests; and (3) the regulation forbidding without prior approval the export from Alaska of unprocessed timber or its shipment to other States demonstrates that it is the Alaska wood-processing industry in particular, not the domestic wood-processing industry generally, that has been the object of federal concern.

Acceptance of Alaska's three factual propositions does not mandate acceptance of its conclusion. Neither South-

Central nor the United States[6] challenges the existence of a federal policy to restrict the out-of-state shipment of unprocessed Alaska timber from federal lands. They challenge only the derivation from that policy of an affirmative expression of federal approval of a parallel policy with respect to state timber. They argue that our cases dealing with congressional authorization of otherwise impermissible state interference with interstate commerce have required an "express" statement of such authorization, and that no such authorization may be implied.

It is true that most of our cases have looked for an express statement of congressional policy prior to finding that state regulation is permissible. For example, in *Sporhase* v. *Nebraska ex rel. Douglas, supra,* the Court declined to find congressional authorization for state-imposed burdens on interstate commerce in ground water despite 37 federal statutes and a number of interstate compacts that demonstrated Congress' deference to state water law. We noted that on those occasions in which consent has been found, congressional intent and policy to insulate state legislation from Commerce Clause attack have been "expressly stated." 458 U. S., at 960. Similarly, in *New England Power Co.* v. *New Hampshire,* 455 U. S. 331 (1982), we rejected a claim by the State of New Hampshire that its restriction on the interstate flow of privately owned and produced electricity was authorized by § 201(b) of the Federal Power Act. That section provides that the Act "shall not . . . deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line." 16 U. S. C. § 824(b). We found nothing in the statute or legislative history "evinc[ing] a congressional intent 'to alter the limits of state power otherwise imposed by the Commerce Clause.'" 455 U. S., at 341

---

[6] The United States appears as *amicus curiae* in support of the position of South-Central.

(quoting *United States* v. *Public Utilities Comm'n of California*, 345 U. S. 295, 304 (1953)).

Alaska relies in large part on this Court's recent opinion in *White* v. *Massachusetts Council of Construction Employers, Inc.*, 460 U. S. 204 (1983), for its "implicit approval" theory. At issue in *White* was an executive order issued by the Mayor of Boston requiring all construction projects funded by the city or by funds that the city had authority to administer, to be performed by a work force consisting of at least 50% residents of the city. A number of the projects were funded in part with federal Urban Development Action Grants. The Court held that insofar as the city expended its own funds on the projects, it was a market participant unconstrained by the dormant Commerce Clause; insofar as the city expended federal funds, "the order was affirmatively sanctioned by the pertinent regulations of those programs." *Id.*, at 215. Alaska relies on the Court's statements in *White* that the federal regulations "affirmatively permit" and "affirmatively sanctio[n]" the executive order and that the order "sounds a harmonious note" with the federal regulations, and it finds significance in the fact that the Court did not use the words "expressly stated."

Rather than supporting the position of the State, we believe that *White* undermines it. If approval of state burdens on commerce could be implied from parallel federal policy, the Court would have had no reason to rely upon the market-participant doctrine to uphold the executive order. Instead, the order could have been upheld as being in harmony with federal policy as expressed in regulations governing the expenditure of federal funds.

There is no talismanic significance to the phrase "expressly stated," however; it merely states one way of meeting the requirement that for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear. The requirement that Congress affirmatively contemplate otherwise invalid state legis-

lation is mandated by the policies underlying dormant Commerce Clause doctrine. It is not, as Alaska asserts, merely a wooden formalism. The Commerce Clause was designed "to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes* v. *Oklahoma*, 441 U. S. 322, 325 (1979). Unrepresented interests will often bear the brunt of regulations imposed by one State having a significant effect on persons or operations in other States. Thus, "when the regulation is of such a character that its burden falls principally upon those without the state, legislative action is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state." *South Carolina State Highway Dept.* v. *Barnwell Brothers, Inc.*, 303 U. S. 177, 185, n. 2 (1938); see also *Southern Pacific Co.* v. *Arizona*, 325 U. S., at 767–768, n. 2. On the other hand, when Congress acts, all segments of the country are represented, and there is significantly less danger that one State will be in a position to exploit others. Furthermore, if a State is in such a position, the decision to allow it is a collective one. A rule requiring a clear expression of approval by Congress ensures that there is, in fact, such a collective decision and reduces significantly the risk that unrepresented interests will be adversely affected by restraints on commerce.[7]

The fact that the state policy in this case appears to be consistent with federal policy—or even that state policy furthers the goals we might believe that Congress had in mind—is an insufficient indicium of congressional intent. Congress acted only with respect to federal lands; we cannot infer from that fact that it intended to authorize a similar policy with respect

---

[7] The need for affirmative approval is heightened by the fact that Alaska's policy has substantial ramifications beyond the Nation's borders. The need for a consistent and coherent foreign policy, which is the exclusive responsibility of the Federal Government, enhances the necessity that congressional authorization not be lightly implied.

to state lands.[8]   Accordingly, we reverse the contrary judgment of the Court of Appeals.

## III

We now turn to the issues left unresolved by the Court of Appeals.   The first of these issues is whether Alaska's restrictions on export of unprocessed timber from state-owned lands are exempt from Commerce Clause scrutiny under the "market-participant doctrine."

Our cases make clear that if a State is acting as a market participant, rather than as a market regulator, the dormant Commerce Clause places no limitation on its activities.   See *White* v. *Massachusetts Council of Construction Employers, Inc.*, 460 U. S., at 206–208; *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 436–437 (1980); *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 810 (1976).   The precise contours of the market-participant doctrine have yet to be established, however, the doctrine having been applied in only three cases of this Court to date.

The first of the cases, *Hughes* v. *Alexandria Scrap Corp.*, *supra*, involved a Maryland program designed to reduce the number of junked automobiles in the State.   A "bounty" was established on Maryland-licensed junk cars, and the State imposed more stringent documentation requirements on out-

---

[8] It is for that reason that we need not resolve the dispute between the parties about whether Congress' purpose in applying the primary-manufacture requirement to federal lands was for the purpose of encouraging the Alaska wood-processing industry or whether it was merely to ensure adequate processing capacity to deal with federal timber.   In either event, no congressional intent to permit a primary-manufacture requirement by the State appears.

It is worthy of note, although we do not rely upon it, that Congress has been requested to authorize the imposition by States of in-state processing requirements but has declined to do so.   Prohibit Export of Unprocessed Timber: Hearing on H. R. 639 before the Subcommittee on Forests, Family Farms, and Energy of the House Committee on Agriculture, 97th Cong., 1st Sess., 18–19 (1981).

of-state scrap processors than on in-state ones. The Court rejected a Commerce Clause attack on the program, although it noted that under traditional Commerce Clause analysis the program might well be invalid because it had the effect of reducing the flow of goods in interstate commerce. *Id.*, at 805. The Court concluded that Maryland's action was not "the kind of action with which the Commerce Clause is concerned," *ibid.*, because "[n]othing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Id.*, at 810 (footnote omitted).

In *Reeves, Inc.* v. *Stake, supra,* the Court upheld a South Dakota policy of restricting the sale of cement from a state-owned plant to state residents, declaring that "[t]he basic distinction drawn in *Alexandria Scrap* between States as market participants and States as market regulators makes good sense and sound law." *Id.*, at 436. The Court relied upon "'the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Id.*, at 438–439 (quoting *United States* v. *Colgate & Co.*, 250 U. S. 300, 307 (1919)). In essence, the Court recognized the principle that the Commerce Clause places no limitations on a State's refusal to deal with particular parties when it is participating in the interstate market in goods.

The most recent of this Court's cases developing the market-participant doctrine is *White* v. *Massachusetts Council of Construction Employers, Inc., supra,* in which the Court sustained against a Commerce Clause challenge an executive order of the Mayor of Boston that required all construction projects funded in whole or in part by city funds or city-administered funds to be performed by a work force of at least 50% city residents. The Court rejected the argument that the city was not entitled to the protection of the doctrine because the order had the effect of regulating employment contracts between public contractors and their employees. *Id.*,

at 211, n. 7. Recognizing that "there are some limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business," the Court found it unnecessary to define those limits because "[e]veryone affected by the order [was], in a substantial if informal sense, 'working for the city.'" *Ibid.* The fact that the employees were "working for the city" was "crucial" to the market-participant analysis in *White. United Building and Construction Trades Council* v. *Mayor of Camden,* 465 U. S. 208, 219 (1984).

The State of Alaska contends that its primary-manufacture requirement fits squarely within the market-participant doctrine, arguing that "Alaska's entry into the market may be viewed as precisely the same type of subsidy to local interests that the Court found unobjectionable in *Alexandria Scrap.*" Brief for Respondents 24. However, when Maryland became involved in the scrap market it was as a purchaser of scrap; Alaska, on the other hand, participates in the timber market, but imposes conditions downstream in the timber-processing market. Alaska is not merely subsidizing local timber processing in an amount "roughly equal to the difference between the price the timber would fetch in the absence of such a requirement and the amount the state actually receives." *Ibid.* If the State directly subsidized the timber-processing industry by such an amount, the purchaser would retain the option of taking advantage of the subsidy by processing timber in the State or forgoing the benefits of the subsidy and exporting unprocessed timber. Under the Alaska requirement, however, the choice is made for him: if he buys timber from the State he is not free to take the timber out of state prior to processing.

The State also would have us find *Reeves* controlling. It states that "*Reeves* made it clear that the Commerce Clause imposes no limitation on Alaska's power to choose the terms on which it will sell its timber." Brief for Respondents 25. Such an unrestrained reading of *Reeves* is unwarranted. Although the Court in *Reeves* did strongly endorse the right of

a State to deal with whomever it chooses when it participates
in the market, it did not—and did not purport to—sanction
the imposition of any terms that the State might desire.   For
example, the Court expressly noted in *Reeves* that "Com-
merce Clause scrutiny may well be more rigorous when a re-
straint on foreign commerce is alleged," 447 U. S., at 438,
n. 9; that a natural resource "like coal, timber, wild game, or
minerals," was not involved, but instead the cement was "the
end product of a complex process whereby a costly physical
plant and human labor act on raw materials," *id.*, at 443–444;
and that South Dakota did not bar resale of South Dakota
cement to out-of-state purchasers, *id.*, at 444, n. 17.   In this
case, all three of the elements that were not present in
*Reeves*—foreign commerce, a natural resource, and restric-
tions on resale—are present.

Finally, Alaska argues that since the Court in *White*
upheld a requirement that reached beyond "the boundary of
formal privity of contract," 460 U. S., at 211, n. 7, then, *a
fortiori*, the primary-manufacture requirement is permissi-
ble, because the State is not regulating contracts for resale
of timber or regulating the buying and selling of timber, but
is instead "a seller of timber, pure and simple."   Brief for
Respondents 28.   Yet it is clear that the State is more than
merely a seller of timber.   In the commercial context, the
seller usually has no say over, and no interest in, how the
product is to be used after sale; in this case, however, pay-
ment for the timber does not end the obligations of the pur-
chaser, for, despite the fact that the purchaser has taken
delivery of the timber and has paid for it, he cannot do with
it as he pleases.   Instead, he is obligated to deal with a
stranger to the contract after completion of the sale.[9]

---

[9] The facts of the present case resemble closely the facts of *Foster-
Fountain Packing Co.* v. *Haydel*, 278 U. S. 1 (1928), in which the Court
struck down a Louisiana law prohibiting export from the State of any
shrimp from which the heads and hulls had not been removed.   The Court

That privity of contract is not always the outer boundary of permissible state activity does not necessarily mean that the Commerce Clause has no application within the boundary of formal privity. The market-participant doctrine permits a State to influence "a discrete, identifiable class of economic activity in which [it] is a major participant." *White* v. *Massachusetts Council of Construction Workers, Inc.*, 460 U. S., at 211, n. 7. Contrary to the State's contention, the doctrine is not *carte blanche* to impose any conditions that the State has the economic power to dictate, and does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity. See Tr. of Oral Arg. 35.

The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market.[10] Unless the

---

rejected the claim that the fact that the shrimp were owned by the State authorized the State to impose such limitations. Although not directly controlling here, because of the Court's recognition that "the State owns, or has power to control, the game and fish within its borders not absolutely or as proprietor or for its own use or benefit but in its sovereign capacity as representative of the people," *id.*, at 11, the Court's reasoning is relevant. The Court noted that the State might have retained the shrimp for consumption and use within its borders, but "by permitting its shrimp to be taken and all the products thereof to be shipped and sold in interstate commerce, the State necessarily releases its hold and, as to the shrimp so taken, definitely terminates its control." *Id.*, at 13.

[10] The view of the market-participant doctrine expressed by JUSTICE REHNQUIST, *post*, at 102–103, would validate under the Commerce Clause any contractual condition that the State had the economic power to impose, without regard to the relationship of the subject matter of the contract and the condition imposed. If that were the law, it would have been irrelevant that the employees in *White* v. *Massachusetts Council of Construction Workers, Inc.*, 460 U. S. 204 (1983), were in effect "working for the city." *Id.*, at 211, n. 7. If the only question were whether the condition is im-

"market" is relatively narrowly defined, the doctrine has the potential of swallowing up the rule that States may not impose substantial burdens on interstate commerce even if they act with the permissible state purpose of fostering local industry.

At the heart of the dispute in this case is disagreement over the definition of the market. Alaska contends that it is participating in the processed timber market, although it acknowledges that it participates in no way in the actual processing. *Id.*, at 34. South-Central argues, on the other hand, that although the State may be a participant in the timber market, it is using its leverage in that market to exert a regulatory effect in the processing market, in which it is not a participant. We agree with the latter position.

There are sound reasons for distinguishing between a State's preferring its own residents in the initial disposition of goods when it is a market participant and a State's attachment of restrictions on dispositions subsequent to the goods coming to rest in private hands. First, simply as a matter of intuition a state market participant has a greater interest as a "private trader" in the immediate transaction than it has in what its purchaser does with the goods after the State no longer has an interest in them. The common law recognized such a notion in the doctrine of restraints on alienation. See *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373, 404 (1911); but cf. *Continental T.V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 53, n. 21 (1977). Similarly, the antitrust laws place limits on vertical restraints. It is no defense in an action charging vertical trade restraints that the same end could be achieved through vertical integration; if it were, there would be virtually no antitrust scrutiny of vertical arrangements. We reject the contention that a State's action as a market regulator may be upheld against Commerce Clause challenge on the ground that the State could

---

posed by contract, a residency requirement could have been imposed with respect to the work force on all projects of any employer doing business with the city.

achieve the same end as a market participant. We therefore find it unimportant for present purposes that the State could support its processing industry by selling only to Alaska processors, by vertical integration, or by direct subsidy. See Tr. of Oral Arg. 34, 37, 45.

Second, downstream restrictions have a greater regulatory effect than do limitations on the immediate transaction. Instead of merely choosing its own trading partners, the State is attempting to govern the private, separate economic relationships of its trading partners; that is, it restricts the post-purchase activity of the purchaser, rather than merely the purchasing activity. In contrast to the situation in *White*, this restriction on private economic activity takes place after the completion of the parties' direct commercial obligations, rather than during the course of an ongoing commercial relationship in which the city retained a continuing proprietary interest in the subject of the contract.[11] In sum, the State may not avail itself of the market-participant doctrine to immunize its downstream regulation of the timber-processing market in which it is not a participant.

## IV

Finally, the State argues that even if we find that Congress did not authorize the processing restriction, and even if we conclude that its actions do not qualify for the market-participant exception, the restriction does not substantially burden interstate or foreign commerce under ordinary Commerce Clause principles. We need not labor long over that contention.

Viewed as a naked restraint on export of unprocessed logs, there is little question that the processing requirement cannot survive scrutiny under the precedents of the Court. For

---

[11] This is not to say that the State could evade the reasoning of this opinion by merely including a provision in its contract that title does not pass until the processing is complete. It is the substance of the transaction, rather than the label attached to it, that governs Commerce Clause analysis.

example, in *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970), we invalidated a requirement of the State of Arizona that all Arizona cantaloupes be packed within the State. The Court noted that the State's purpose was "to protect and enhance the reputation of growers within the State," a purpose we described as "surely legitimate." *Id.*, at 143. We observed:

> "[T]he Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere. Even where the State is pursuing a clearly legitimate local interest, this particular burden on commerce has been declared to be virtually *per se* illegal. *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1; *Johnson* v. *Haydel*, 278 U. S. 16; *Toomer* v. *Witsell*, 334 U. S. 385." *Id.*, at 145.

We held that if the Commerce Clause forbids a State to require work to be done within the State for the purpose of promoting employment, then, *a fortiori*, it forbids a State to impose such a requirement to enhance the reputation of its producers. Because of the protectionist nature of Alaska's local-processing requirement and the burden on commerce resulting therefrom, we conclude that it falls within the rule of virtual *per se* invalidity of laws that "bloc[k] the flow of interstate commerce at a State's borders." *City of Philadelphia* v. *New Jersey*, 437 U. S. 617, 624 (1978).

We are buttressed in our conclusion that the restriction is invalid by the fact that foreign commerce is burdened by the restriction. It is a well-accepted rule that state restrictions burdening foreign commerce are subjected to a more rigorous and searching scrutiny. It is crucial to the efficient execution of the Nation's foreign policy that "the Federal Government . . . speak with one voice when regulating commercial relations with foreign governments." *Michelin Tire Corp.* v. *Wages*, 423 U. S. 276, 285 (1976); see also *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434 (1979). In light of the substantial attention given by Congress to the subject of

export restrictions on unprocessed timber, it would be peculiarly inappropriate to permit state regulation of the subject. See Prohibit Export of Unprocessed Timber: Hearing on H. R. 639 before the Subcommittee on Forests, Family Farms, and Energy of the House Committee on Agriculture, 97th Cong., 1st Sess. (1981).

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with the opinion of this Court.

*It is so ordered.*

JUSTICE MARSHALL took no part in the decision of this case.

JUSTICE BRENNAN, concurring.

I join JUSTICE WHITE's opinion in full because I believe Alaska's in-state processing requirement constitutes market regulation that is not authorized by Congress. In my view, JUSTICE WHITE's treatment of the market-participant doctrine and the response of JUSTICE REHNQUIST point up the inherent weakness of the doctrine. See *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 817 (1976) (BRENNAN, J., dissenting).

JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, concurring in part and concurring in the judgment.

I join Parts I and II of JUSTICE WHITE's opinion. I would remand the case to the Court of Appeals to allow that court to consider whether Alaska was acting as a "market participant" and whether Alaska's primary-manufacture requirement substantially burdened interstate commerce under the holding of *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970).

JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR joins, dissenting.

In my view, the line of distinction drawn in the plurality opinion between the State as market participant and the

State as market regulator is both artificial and unconvincing. The plurality draws this line "simply as a matter of intuition," *ante*, at 98, but then seeks to bolster its intuition through a series of remarks more appropriate to antitrust law than to the Commerce Clause.* For example, the plurality complains that the State is using its "leverage" in the timber market to distort consumer choice in the timber-processing market, *ibid.*, a classic example of a tying arrangement. See, *e. g., United States Steel Corp.* v. *Fortner Enterprises, Inc.,* 429 U. S. 610, 619–621 (1977). And the plurality cites the common-law doctrine of restraints on alienation and the antitrust limits on vertical restraints in dismissing the State's claim that it could accomplish exactly the same result in other ways. *Ante,* at 98–99.

Perhaps the State's actions do raise antitrust problems. But what the plurality overlooks is that the antitrust laws apply to a State only when it is acting as a market participant. See, *e. g., Jefferson County Pharmaceutical Assn., Inc.* v. *Abbott Laboratories,* 460 U. S. 150, 154 (1983) (state action immunity "does not apply where a State has chosen to compete in the private retail market"). When the State acts as a market regulator, it is immune from antitrust scrutiny. See *Parker* v. *Brown,* 317 U. S. 341, 350–352 (1943). Of course, the line of distinction in cases under the Commerce Clause need not necessarily parallel the line drawn in anti-

---

*The plurality does offer one other reason for its demarcation of the boundary between these two concepts.

"[D]ownstream restrictions have a greater regulatory effect than do limitations on the immediate transaction. Instead of merely choosing its own trading partners, the State is attempting to govern the private, separate economic relationships of its trading partners; that is, it restricts the postpurchase activity of the purchaser, rather than merely the purchasing activity." *Ante,* at 99.

But, of course, this is not a "reason" at all, but merely a restatement of the conclusion. The line between participation and regulation is what we are trying to determine. To invoke that very distinction in support of the line drawn is merely to fall back again on intuition.

trust law. But the plurality can hardly justify placing Alaska in the market-regulator category, in this Commerce Clause case, by relying on antitrust cases that are relevant only if the State is a market participant.

The contractual term at issue here no more transforms Alaska's sale of timber into "regulation" of the processing industry than the resident-hiring preference imposed by the city of Boston in *White* v. *Massachusetts Council of Construction Employers, Inc.*, 460 U. S. 204 (1983), constituted regulation of the construction industry. Alaska is merely paying the buyer of the timber indirectly, by means of a reduced price, to hire Alaska residents to process the timber. Under existing precedent, the State could accomplish that same result in any number of ways. For example, the State could choose to sell its timber only to those companies that maintain active primary-processing plants in Alaska. *Reeves, Inc.* v. *Stake*, 447 U. S. 429 (1980). Or the State could directly subsidize the primary-processing industry within the State. *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794 (1976). The State could even pay to have the logs processed and then enter the market only to sell processed logs. See *ante*, at 99. It seems to me unduly formalistic to conclude that the one path chosen by the State as best suited to promote its concerns is the path forbidden it by the Commerce Clause.

For these reasons, I would affirm the judgment of the Court of Appeals.