

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-16-1995

# Atlantic Coast v Bd Chosen Free

Precedential or Non-Precedential:

Docket 94-5173

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Atlantic Coast v Bd Chosen Free" (1995). *1995 Decisions.* Paper 52.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/52

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


N0. 94-5173


ATLANTIC COAST DEMOLITION & RECYCLING, INC.

Appellant

v.

BOARD OF CHOSEN FREEHOLDERS OF ATLANTIC COUNTY;
ATLANTIC COUNTY UTILITIES AUTHORITY;
BOARD OF CHOSEN FREEHOLDERS OF CAMDEN COUNTY;
POLLUTION CONTROL FINANCING AUTHORITY OF CAMDEN COUNTY;
SCOTT WEINER, individually and in his capacity as Commissioner
of New Jersey Department of Environmental Protection and Energy


On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 93-cv-02669)


Argued September 13, 1994

BEFORE:  STAPLETON, ALITO and LEWIS, <u>Circuit Judges</u>

(Opinion Filed February 16, 1995)

Mark R. Rosen (Argued)
Jodi Isenberg
Mesirov, Gelman, Jaffe, Cramer &
Jamieson
44 Tanner Street
P.O. Box 183
Haddonfield, NJ 08033-0141
 Attorneys for Appellant

William J. Linton
Atlantic County Utilities
Authority
6700 Delilah Road
Pleasantville, NJ 08232

James J. Ciancia
Acting Attorney General
of New Jersey
Andrea M. Silkowitz
Ass't Attorney General
Gail M. Lambert (Argued)
Stefanie A. Brand
Deputy Attorneys General
124 Halsey Street
P. O. Box 45029
Newark, NJ 07101
 Attorneys for Appellee
 Scott Weiner

Attorney for Appellee
Atlantic County Utility Authority

Frederick J. Schuck
14th Floor
Office of Camden County Counsel
520 Market Street
Camden, NJ 08102
 Attorney for Appellee
 Board of Chosen Freeholders
 of Camden County

Jonathan L. Williams
J.S. Lee Cohen (Argued)
Michael S. Caro
DeCotiis, Fitzpatrick & Gluck
401 Hackensack Avenue
Hackensack, NJ 07601
 Attorneys for Amici Curiae
 Hudson County Improvement Authority,
 Passaic County Utilities Authority and
 Essex County Utilities Authority
 Mercer County Improvement Authority

Joseph J. Slachetka
John A. Mercer, Jr.
Higgins, Slachetka & Long
1027 Chews Landing Road
Laurel Springs, NJ 08021
 Attorneys for Amicus Curiae
 Cape May County Municipal Utilities
 Authority

Gail B. Phelps, Assistant Counsel
Bureau of Regulatory Counsel
9th Floor, MSSOB
400 Market Street
Harrisburg, PA 17101-2301
 Attorney for Amicus Curiae
 Pennsylvania Department of
 Environmental Resources

Betty Jo Christian
Paul J. Ondrasik, Jr.
William T. Hassler
Steptoe & Johnson
1330 Connecticut Ave., N.W.
Washington, D.C. 20036
 and
Bruce J. Parker (Of Counsel)
Alan S. Ashkinaze (Of Counsel)
 and

Michael F. Riccardelli
Ronald S. Bergamini
Riccardelli, Rose & Hoonhoudt
51 Park Street
Montclair, NJ 07042
  Attorneys for Amici Curiae
 City of Jersey City, Borough of
 Northvale, C & A Carbone, Inc.,
 National Solid Wastes Management
 Association, and Waste Management
 Association of New Jersey

OPINION OF THE COURT

STAPLETON, Circuit Judge:

This appeal concerns the constitutional validity of New Jersey's solid waste regulatory scheme. Atlantic Coast Demolition and Recycling, Inc. ("Atlantic Coast") sought to enjoin enforcement of New Jersey's waste flow regulations on the ground they violate the dormant Commerce Clause. The district court entered judgment in favor of defendant New Jersey Department of Environmental Protection and Energy ("the Department"), finding that the flow control regulations did not impose an unconstitutional burden on interstate commerce. Atlantic Coast appealed. We will reverse.

Shortly after the district court entered final judgment upholding the flow control regulations, the Supreme Court issued its decision in C & A Carbone, Inc. v. Town of Clarkstown, 114 S. Ct. 1677 (1994), in which the Court struck down a local flow

control ordinance of the Town of Clarkstown, New York, as violative of the dormant Commerce Clause. In light of the Supreme Court's recent teachings, we conclude that the district court erred in holding that the regulations do not discriminate against interstate commerce and in applying the balancing test set forth in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). Because the district court did not consider whether the regulations could pass muster under the stricter dormant Commerce Clause test applicable to discriminatory measures, we will vacate the district court's judgment and remand so that the district court may determine whether the regulations can be upheld despite their discriminatory effect.[1]

I.

The facts of this case are generally not in dispute.[2] The necessary factual background concerns New Jersey's waste management system and Atlantic Coast's activities.

---

[1]. The district court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as the constitutionality of state regulations was challenged and we have jurisdiction over this appeal from the district court's final judgment pursuant to 28 U.S.C. § 1291.

[2]. While the Department argues that some of the district court's findings of fact were clearly erroneous, the "facts" it takes issue with actually involve the district court's application of the governing legal principles to the facts, which we discuss infra. The factual background summarized by the district court in its oral opinion of September 8, 1993, is supported by the record and is therefore not clearly erroneous. See Cox v. Keystone Carbon Co., 894 F.2d 647, 650 (3d Cir.) (the reviewing court is not to substitute its own findings for that of the district court, but "may only make an assessment of whether

A.  New Jersey's Solid Waste Management System

New Jersey has an extensive statutory and regulatory system governing the management and disposal of solid waste. This highly regulated system grew out of a crisis that began in the 1970s as a result of wide-spread illegal practices in the then private, unregulated waste disposal market and the closing of many landfills due to unsanitary conditions and noncompliance with newly enacted federal regulations.  This crisis has been documented in the caselaw of both this court and the New Jersey courts.  See, e.g., J. Filiberto Sanitation v. Department of Envtl. Protection, 857 F.2d 913, 918-19 (3d Cir. 1988); Trade Waste Management Ass'n, Inc. v. Hughey, 780 F.2d 221, 223 (3d Cir. 1985); A.A. Mastrangelo, Inc. v. Commissioner of Department of Envtl. Protection, 449 A.2d 516, 518-19, 521 (N.J. 1982); Hackensack Meadowlands Dev. Comm'n v. Municipal Sanitary Landfill Auth., 348 A.2d 505 (N.J. 1975), rev'd sub nom. City of Philadelphia v. New Jersey, 437 U.S. 617 (1977); Southern Ocean Landfill, Inc. v. Mayor & Council of the Township of Ocean, 314 A.2d 65, 66-67 (N.J. 1974); In re Scioscia, 524 A.2d 855, 857 (N.J. Super. Ct. App. Div. 1987).  As the Department has observed in a recent update to its Statewide Solid Waste Management Plan:

> By the early 1980s, the department had
> closed, or was in the process of closing,
> over 300 unsafe or unregulated landfills that
> posed serious environmental hazards or had

(..continued)
there is enough evidence to support such findings"), cert. denied, 498 U.S. 811 (1990).

exhausted capacity.  However, the department's persistent actions to implement rigorous environmental standards on landfill construction and operations, coupled with a steady influx of millions of tons of waste annually from neighboring states during the 1970s, resulted in a serious shortfall of disposal capacity in the state. . . .

By the late 1980s, the "solid waste crisis" had become a national issue, and New Jersey, the most densely populated state in the union, was at the forefront of both the problem and the solution.  Responding to the need to develop safe, efficient systems, by 1990 the state/county planning process produced 13 new major disposal facilities . . . . Despite this remarkable progress, however, a number of additional counties were forced by the continuing capacity shortages to make disposal arrangements with out-of-state facilities, and New Jersey, once a net importer of waste, became a net exporter with peak exports of 28% of all solid waste generated in the state in 1988.  As national attention focused on the environmental concerns associated with solid waste management practices, a number of states moved to restrict the importation of waste. On several occasions, New Jersey waste was banned, without notice, from out-of-state facilities, resulting in serious disruptions of service and unhealthy conditions as waste collected in the streets.

New Jersey Dep't of Envtl. Protection and Energy, Div. of Solid Waste Management, Solid Waste Management State Plan Update: 1993-2002, Executive Summary 1-2 (Draft Jan. 1993) (App. 511-12) [hereinafter State Plan Update-Executive Summary].

New Jersey's existing statutory and regulatory waste management system is the result of attempts to respond to this

crisis.[3]  The two major statutory provisions of New Jersey's solid waste management system are the Solid Waste Management Act ("SWMA"), N.J. Stat. Ann. § 13:1E-1 to -207 (West 1991 & Supp. 1994), and the Solid Waste Utility Control Act ("SWUCA"), N.J. Stat. Ann. § 48:13A-1 to -13 (West Supp. 1994).  These acts were passed in 1970 to establish a statutory framework to coordinate "all solid waste collection, disposal, and utilization activity" in the state, N.J. Stat. Ann. § 13:1E-2(b)(1) (West 1991), and to regulate the rates at which these services are provided as a means of providing safe, adequate, and proper waste management services, N.J. Stat. Ann. § 48:13A-2 (West Supp. 1994).

The Department is vested with broad regulatory authority,[4] while direct management responsibility is delegated to the twenty-two solid waste management districts that comprise the state, one for each of New Jersey's counties plus the Hackensack Meadowlands District.  See N.J. Stat. Ann. § 13:1D-19 (West 1991).  Each solid waste district is responsible for developing a ten-year solid waste management plan that must be approved by the Department before it is implemented.  Id.

---

[3].      An attempt to conserve landfill space by instituting a qualified ban on the importation of solid waste was struck down by the United States Supreme Court as violative of the dormant Commerce Clause in City of Philadelphia v. New Jersey, 437 U.S. 617 (1977).

[4].      Solid waste management functions delegated to the Board of Public Utilities were transferred to the Department in 1991. See Reorganization Plan No. 002-1991, set out as note under N.J. Stat. Ann. § 13:1D-1 (West 1991).

§§ 13:1E-20, 13:1E-24 (West 1991).  In each waste district, solid waste disposal is managed either directly by the county government or by municipal authorities created and designated by the district for this purpose.[5]  Each district's waste plan must provide for "sufficient [and] suitable" disposal facilities to treat and accommodate all solid waste generated within the waste district; the districts may meet this obligation by contracting with public or private entities or by constructing and operating the waste facilities themselves.  Id. § 13:1E-21 to -22 (West 1991); §§ 40:14B-19 (West 1991), 40:37A-55 (West 1991), 40:37C-5 (West 1991).  By the early 1980s the Department had approved solid waste management plans for each of the twenty-two solid waste districts.  State Plan Update-Executive Summary, supra, at 1 (App. 511).

In addition to this system of local district management, the disposal facilities[6] themselves are subject to state regulation by the Department.  The private or public entity

---

[5].    These local agencies may be municipal utilities authorities, county improvement authorities, or pollution control financing authorities.  See N.J. Stat. Ann. §§ 40:14B-1, -22.1 (West 1991 & Supp. 1994); 40:37A-103 (West Supp. 1994); 40:37C-3 (West 1991).  Five of the waste districts manage through county control while eleven use the utilities authority model and the remaining six use either county improvement or pollution control financing authorities.

[6].    Disposal facilities include transfer stations (at which solid waste is transferred from collection vehicles to haulage vehicles for transportation to an offsite disposal facility), resource recovery centers (which engage in both recycling and waste disposal), sanitary landfills, and incinerators.  N.J. Stat. Ann. § 48:13A-3 (West Supp. 1994).

performing the disposal service must register with and obtain
approval from the Department before providing disposal service,
N.J. Stat. Ann. § 13:1E-5 (West 1991), and must obtain a
certificate of public convenience and necessity from the Board of
Regulatory Commissioners, id. § 48:13A-6 (West Supp. 1994).  To
register with the Department, a waste disposal facility must
obtain a solid waste permit which is granted only after review of
the appropriateness of the facility's location, its effect on the
surrounding community, and its consistency with the state and
district solid waste plans.  N.J. Admin. Code tit. 7, §§ 26-2.3
to -2.4; 26-2.8 to -2.9.  Waste disposal permits are also
conditioned on the facility's operator satisfying the "integrity"
requirements contained in N.J. Stat. Ann. § 13:1E-126 to -135
(West 1991 & Supp. 1994),[7] and only disposal facilities included
in a district plan will receive operating permits, id. § 13:1E-4,
-26 (West 1991 & Supp. 1994).

Additionally, all disposal facilities are regulated on
the state level as public utilities.  N.J. Stat. Ann. § 13:1E-27
(West Supp. 1994).  Pursuant to traditional utility regulation,
the disposal facilities must therefore provide their services at
just and reasonable rates, id. § 48:13A-2 (West Supp. 1994), in a
nondiscriminatory manner, id. § 48:3-3, -4 (West Supp. 1994), and
may not abandon or discontinue service without authorization, id.
§ 48:2-24 (West 1969).  Nor may the solid waste facilities adjust

---

[7].        These requirements were enacted in response to the
illegal anti-competitive activities that previously existed
within the private waste industry.

their rates without regulatory approval.  Id. § 48:2-21 (West 1969).

Like waste disposal, solid waste collection was originally regulated under the utility structure as well, but pursuant to the Solid Waste Collection Regulatory Reform Act, which became effective in 1992, waste collection services will no longer be regulated as public utilities, although they will continue to be under the supervision of the Board of Regulatory Commissioners.  See N.J. Stat. Ann. §§ 48:13A-7.1 to 48:13A-7.23 (West Supp. 1994).  Thus, although waste collection rates will no longer be regulated, a company will still be required to register and obtain a certificate of public convenience before performing waste collection services in the state. See id. § 13:1E-5(a) (West 1991); id. § 48:13A-6 (West Supp. 1994). Full rate deregu- lation of the waste collection industry will occur in April 1996.[8]

Additionally, the Board of Regulatory Commissioners may designate a district as a solid waste disposal franchise area to be served by one or more entities engaged in waste disposal. N.J. Stat. Ann. § 48:13A-5 (West Supp. 1994).  According to the Department, such franchises have been awarded to most of the districts and public authorities responsible for the waste

---

[8].      Under the former rate regulation system, the regulated rate for government-owned disposal facilities became, by operation of law, a component of the tariff of all solid waste collectors.  N.J. Stat. Ann. § 48:13A-7.8 (West Supp. 1994). This aspect of the system will continue until full deregulation in 1996.

districts' solid waste management.[9]  A franchise grants a solid waste disposal facility the "exclusive right to control and provide for the disposal of solid waste, except for recyclable material whenever markets for those materials are available, within a district or districts" as long as the proposed franchise is consistent with the district's solid waste plan.  Id.  The district government or public authority, as franchisee, may operate the disposal facility itself, or contract with another district or with a private facility.

As an integral part of the district plan and utility regulation system, the Department and waste districts are authorized under the SWMA and SWUCA to direct the flow of waste to designated facilities.  N.J. Stat. Ann. § 48:13A-4(c) (West Supp. 1994); Op. N.J. Att'y Gen. No. 3 (1980).  It is the resultant waste flow regulations that Atlantic Coast challenges in this action.  The waste flow requirements enable the waste districts to control the processing and disposal of all solid waste generated within the district.  See Op. N.J. Att'y Gen. No. 3 (1980).  The district plans specify to which disposal facility the waste from each of New Jersey's 567 municipalities is directed, and these designations are codified as Department regulations.  N.J. Admin. Code tit. 7, § 26-6.5.

These waste flow measures do not apply to separated recyclable materials.  N.J. Admin. Code tit. 7, § 26-1.1(a)(1).

---

[9].      Amici Hudson County Improvement Authority, Passaic County Utilities Authority, and Essex County Utilities Authority have all been awarded such franchises.

The separation of recyclables from other waste at the source of the waste and the marketing of recyclables may be performed competitively by private entities, and these activities are subject to much less stringent overall regulation than waste management services.  See, e.g., N.J. Admin. Code tit.7, §§ 26A-1.4(a)(2) (exemption of traditional recyclables from Department approval process), 26A-3.1 (regulation of nontraditional recyclables).  Mixed waste, because it contains both waste and recyclables and therefore presents environmental risks not associated with separated recyclables, is subject to the waste flow regulations.  Under recently promulgated regulations that memorialize the Department's previously informal "Pereira policy," mixed-waste generated within a waste district may be removed from the district for separation without initial processing at the designated disposal facility, as long as the nonrecyclable residue, or a similar kind and amount, is returned to the designated disposal facility, or if, in lieu of returning any residue waste, a payment equal to the tipping fees that would otherwise be due for the nonrecyclable portion is paid to that facility.  N.J. Admin. Code tit. 7, §§ 26-6.9, 26-2B.9.

The disposal charges, or tipping fees[10] charged by the designated waste facilities are used for operating revenues. See, e.g., N.J. Stat. Ann. § 40:14B-22.1 (West Supp. 1994).

---

[10]. Tipping fees are the rates that a disposal facility or transfer station charges the hauler who deposits waste at the facility.  J. Filiberto Sanitation v. Department of Envtl. Protection, 857 F.2d 913, 916 (3d Cir. 1988).

Because the county governments and public authorities that manage these facilities may raise funds for capital construction by issuing revenue bonds, the tipping fees may also be pledged toward repayment of the bonds.  According to the Department, approximately $1.6 billion in revenue debt has been issued by and remains outstanding to the county governments and authorities. The tipping fees are set by the Board of Regulatory Commissioners at a rate that will enable the waste district to recover the costs associated with its solid waste management plan, including costs associated with disposal and recycling.  See N.J. Stat. Ann. § 48:13A-6.3 (West Supp. 1994).  Because the districts are engaged in aggressive disposal management and recycling programs, the tipping fees are quite high.  Thus, it is often less expensive to dispose of solid waste generated in New Jersey at facilities located in a neighboring state, even when transportation costs to transport the waste to the out-of-state facility are factored in.

The disposal facilities are designated through the district planning process.  N.J. Admin. Code tit. 7, § 26-6.6. The designated facilities may be located within the waste district, in another waste district pursuant to an interdistrict plan, or out-of-state.  Thus, a district plan can propose a contract with an out-of-state disposal facility.  However, district plans must be approved by the Department and the Department candidly acknowledges that the twin "goals of 60% recycling and disposal self-sufficiency for the nonrecyclable waste stream . . . form the core of New Jersey's current solid

waste management system and constitute the statewide solid waste

management objectives, criteria and standards with which the

[district] plans must be consistent."  Appellee's Br. at 11.

Thus, as the district court found:

> Although it is not the subject of a
> clear legislative direction [sic], it is
> equally clear that the D.E.P.E. administers
> the law with the specific goal that all waste
> generated in New Jersey be disposed of within
> the borders of the state.  The 1993 solid
> waste management state plan update, which was
> admitted into evidence and herein referred to
> as the Update, provides:  "As a key policy
> objective, New Jersey will continue to move
> toward achievement of self-sufficiency in
> disposal capacity.  The Department's
> objective is to eliminate reliance on out-of-
> state disposal within a seven-year period."

App. 1017.

Accordingly, a waste district that is unable to

identify sufficient existing waste facilities or suitable sites

within the district, or within another district pursuant to an

interdistrict agreement, to meet the district's waste needs must

certify to the Department the absence of suitable in-district

sites and the failure to reach an interdistrict agreement.  See

N.J. Stat. Ann. § 13:1E-21 (West 1991).  Only after such a

certification, can a waste district plan that designates an out-

of-state disposal site receive Department approval.  In re Long-

Term Out-of-State Waste Disposal Agreement Between County of

Hunterdon & Glendon Energy Commission, 568 A.2d 547, 551-53 (N.J.

Super. Ct. App. Div.), certif. denied, 583 A.2d 337 (1990).[11]

Thus, the designation process is intended to favor operators that have facilities already located within, or those that are willing to construct a facility within, the state.

## B. Atlantic Coast's Activities

Atlantic Coast is a Pennsylvania corporation that was formed in 1989 to operate a transfer station and recycling center for construction and demolition ("C & D") debris. This facility

_____

[11]. As quoted in In re Waste Disposal Agreement, the 1985 Update to the Statewide Solid Waste Management Plan contained the following statement:

> "The Department considers the use of out-of-state disposal facilities to be inappropriate as a long-range solid waste management option. . . .
>
> The uncertainty inherent in use of out-of-state facilities conflicts with the philosophy of the Solid Waste Management Act, which is that districts should be able to plan for and predict the availability of disposal capacity to meet their needs. The Department has allowed several districts to rely upon out-of-state facilities, as a short-term option, in cases where districts have not been able to secure interdistrict agreements for access to in-state capacity. However, it is critical that districts which do rely on out-of-state disposal capacity, secure enforceable assurances from those facilities in order to ensure continued use until in-state facilities can be brought on line. It is equally critical that those districts develop an in-state solution as quickly as practicable."

In re Waste Disposal Agreement, 568 A.2d at 551.

is located in Philadelphia.  Atlantic Coast is licensed by the Commonwealth of Pennsylvania Department of Environmental Resources to accept for processing at its facility various types of construction and demolition debris, including uncontaminated rock, soil, ferrous metals, and wood; recyclables; and unmarketable construction and demolition materials.  Atlantic Coast processes the C & D debris by separating the recyclable materials from the nonrecyclable.  The nonrecyclable residue waste is then shipped to landfills for disposal.  During periods relevant to this appeal, Atlantic Coast was transporting the nonrecyclable waste to a landfill in Ohio.  The majority of the waste processed at the Atlantic Coast facility is not recyclable; by weight only approximately eight and one-half to twenty percent of the waste is recycled.[12]  Thus, most of the materials received by Atlantic Coast are shipped to a landfill for disposal.

Construction and demolition debris is generated when a building is constructed, demolished, or refurbished.  It is not composed of a single material, but is rather a mixture of recyclable and nonrecyclable materials.  As a practical matter, C & D waste is not source separated, that is, the generator of the debris does not separate out the recyclable materials at the construction site.  Prior to separation the mixture of recyclable and nonrecyclable materials is considered waste, but once the

_____

[12].      This figure varies depending on whether wood is included as a recyclable material.  Atlantic Coast was at one time stockpiling the wood at its facility for a particular purchaser, but it appears that in the absence of that arrangement the wood is disposed of as waste.

recyclable portion is separated out, only the remaining nonrecyclable portion is considered waste.  Thus, if Atlantic Coast collects C & D debris from a construction site in New Jersey and transports it to its facility for separation and processing, the waste it collects is subject to New Jersey waste flow regulations.  This means that it is required by those regulations to return the nonrecyclable waste (or equivalent waste) to the source district's designated disposal facility or to pay to that facility an amount equal to the tipping fee it would pay if it returned that portion of the C & D debris to the designated facility.

Because of its proximity to New Jersey's southern counties, Atlantic Coast sought to gain access to the New Jersey's C & D debris market, but its efforts to be included as a designated facility in a district waste management plan were unsuccessful.  Atlantic Coast rejected the alternate means of serving the New Jersey market, i.e., returning the residual waste to the designated facilities for processing, or paying a compensating fee, as too costly.  Following its unsuccessful efforts to serve the New Jersey market, Atlantic Coast filed an action in the district court challenging the constitutionality of New Jersey's solid waste flow control regulations.[13]

---

[13]. In addition to the Commissioner of the New Jersey Department of Environmental Protection and Energy, Atlantic Coast named as defendants two county governments--the Board of Chosen Freeholders of Atlantic County and the Board of Chosen Freeholders of Camden County, and the solid waste authorities within those counties--the Atlantic County Utilities Authority and the Pollution Control Financing Authority of Camden County. Atlantic Coast subsequently reached a settlement agreement with

In its complaint, Atlantic Coast sought a declaration that the district waste plans identified in the flow control regulations violate the Commerce Clause and a permanent injunction barring the defendants from prohibiting or interfering with the transportation of construction and demolition debris from its generation or collection within New Jersey, or in Atlantic and Camden Counties in particular, to facilities outside the state. Although the scope of Atlantic Coast's attack on the New Jersey solid waste management system was somewhat unclear from the complaint, the district court concluded that Atlantic Coast's main contention centered on the waste flow regulations. At oral argument before this court, counsel for Atlantic Coast reiterated that its dormant Commerce Clause allegation and its claim for relief were limited to the waste flow regulations, and in particular the requirement that residual waste from mixed waste loads be returned to each district's designated facility unless the facility is compensated for the lost waste revenue.

## C. The District Court Proceedings

Atlantic Coast moved for a preliminary injunction. Following a short period of intense discovery, an evidentiary hearing was held on Atlantic Coast's motion, at which a substantial amount of deposition and live testimony was admitted.

(..continued)
the county and authority defendants, pursuant to which those defendants would not participate in the district court action or in any appeals, but would be bound by the court's determination. The Department therefore became the sole remaining defendant.

The district court promptly issued an opinion declining to enter a preliminary injunction.  After further discovery, the parties elected to submit the case on its merits based on the preliminary injunction record without supplementation.  Ultimately, the district court entered final judgment in the Department's favor based on the findings and conclusions in its oral opinion of September 8, 1993.  This appeal followed.[14]

II.

The fundamental issue presented by this appeal is whether the district court erred in concluding that the New Jersey regulatory waste flow scheme does not violate the dormant Commerce Clause.  To determine this fundamental issue, three subsidiary issues must be decided: (1) whether the district court erred in applying the Pike balancing test, rather than what we

[14].        This court granted a stay pending the Supreme Court's disposition in C & A Carbone, Inc. v. Town of Clarkstown.  After the Supreme Court issued its opinion on May 16, 1994, invalidating the Clarkstown waste flow ordinance, Atlantic Coast filed a motion with this court for summary reversal of the district court's final order or expedited disposition of the appeal.  We denied the motion for summary reversal but expedited the appeal.  Amicus curiae briefs were submitted in support of the Department's position by Hudson County Improvement Authority, Passaic County Utilities Authority, Essex County Utilities Authority, and Mercer County Improvement Authority ("Hudson County Amici"); by Cape May County Municipal Utilities Authority; and by the Pennsylvania Department of Environmental Resources. An amicus curiae brief in support of Atlantic Coast's position was submitted by the City of Jersey City, the Borough of Northvale, C & A Carbone, Inc., National Solid Wastes Management Association, and Waste Management Association of New Jersey ("the Municipal and Trade Association Amici").  Additionally, we granted the Hudson County Amici leave to participate in oral argument.

have termed the "heightened scrutiny" test,[15] (2) whether the New Jersey waste flow regulations are excepted from the strictures of Commerce Clause scrutiny under the market participant doctrine, and (3) if not, whether these regulations meet the applicable Commerce Clause test in light of New Jersey's particular circumstances. We conclude that New Jersey's waste flow regulations, in effect and by design, discriminate against interstate commerce and that heightened scrutiny under the dormant Commerce Clause is required. We reject the Department's argument that New Jersey's regulation of waste disposal through a utility system requires application of the less stringent balancing test, and likewise reject its argument that New Jersey is entitled to the market participant exception. Because the district court did not consider whether the waste flow regulations can be upheld despite their discriminatory effect, we will remand to the district court so that it may make this determination in the first instance.

## III.

The Commerce Clause grants to Congress the affirmative power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. "Although the Clause thus speaks in terms of powers bestowed upon Congress, the [Supreme] Court long has recognized that it also limits the power of the States

---

[15]. See Norfolk Southern Corp. v. Oberly, 822 F.2d 388 (3d Cir. 1987).

to erect barriers against interstate trade."  Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 35 (1980).  The negative or dormant aspects of the Commerce Clause that limit state authority apply to subject areas in which "Congress has not affirmatively acted to either authorize or forbid the challenged state activity."  Norfolk Southern Corp. v. Oberly, 822 F.2d 388, 392 (3d Cir. 1987).  Thus, any state regulation of interstate commerce is subject to scrutiny under the dormant Commerce Clause unless such regulation has been preempted or expressly authorized by Congress.  The district court held that Congress has legislated in the area of solid waste disposal but "expressly left to the states the primary role in the collection and disposal of solid waste."  App. 1015-16 (citing the Waste Disposal Act, codified at 42 U.S.C. § 6901(A)(4)).  The parties have not advanced either a preemption or authorization argument before this court, and we decline to examine the issue further.[16]  We therefore turn to the issues of whether and how New Jersey's

---

[16].     We note, however, that Justice O'Connor, concurring in the result reached by the C & A Carbone Court, recently rejected the argument that the federal Waste Disposal Act authorizes discriminatory solid waste measures.  C & A Carbone, Inc. v. Town of Clarkstown, 114 S. Ct. 1677, 1691 (1994) (O'Connor, J., concurring in the judgment).  The district court's determination that Congress has authorized concurrent state legislation in the area of solid waste management is not inconsistent with Justice O'Connor's conclusion that discriminatory measures are not authorized.  We note further that several competing federal measures that expressly authorized local waste flow restrictions, as well as waste importation and exportation bans, were introduced during the 103d Congress, but were not enacted into law.  At least one of these measures has been introduced for consideration by the current Congress as well.

waste flow regulations affect interstate commerce.  The Supreme Court's recent decision in C & A Carbone, Inc. v. Town of Clarkstown, 114 S. Ct. 1677 (1994), provides significant guidance with respect to these issues, and we begin with a review of the opinion of the Court in that case.

A.

The solid waste flow control ordinance before the court in C & A Carbone required that all waste within the town of Clarkstown, New York, be processed at a designated transfer station which the town had caused to be built to comply with a consent decree between the town and the New York State Department of Environmental Conservation.  C & A Carbone, 114 S. Ct. at 1680.  To finance the new facility, the town entered into an arrangement with a local private contractor under which the contractor would build the facility, operate it for five years, and then turn it over to the town for one dollar.  In return, the town guaranteed the contractor a tipping fee of $81.00 per ton and guaranteed that a minimum of 120,000 tons of waste would be deposited at the transfer station for processing each year.  If the total waste brought to the facility was less than 120,000 tons in any year, the town would make up the difference in the lost fees.  Id.

To ensure that the contractor would receive the agreed upon sums, the town enacted its flow control ordinance.  The town was thus assured of customers for the new transfer facility and could finance the facility through the mandated tipping fees. C & A Carbone, who operated a recycling center within the town, was found to be violating the ordinance by transporting waste from its facility to out-of-state locations for processing. C & A Carbone challenged the constitutionality of the ordinance based on the dormant Commerce Clause.  The New York courts concluded that the town's ordinance did not discriminate against

interstate commerce because it applied "evenhandedly to all solid waste processed within the Town." 587 N.Y.S. 2d 681, 686 (N.Y. App. Div. 1992). The Supreme Court reversed.

The Supreme Court first concluded that the ordinance did regulate interstate commerce, rejecting the town's contention that its flow control did nothing more than delay the entry of garbage into the stream of interstate commerce until it was safe. The Court noted that Carbone received and processed solid waste from out of state, and the requirement that it route that waste through the town's transfer station increased the cost of processing for out-of-state waste generators. More importantly for present purposes, the Court pointed out that the relevant stream of interstate commerce was not the market for solid wastes, but rather the market for solid waste processing and disposal services. "[W]hat makes garbage a profitable business is not its own worth but the fact that its possessor must pay to get rid of it. In other words, the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it." C & A Carbone, 114 S.Ct. at 1682.

In addition to the effect on the cost to out-of-state possessors of garbage, the Court stressed that "even as to waste originant in Clarkstown, the ordinance prevents everyone except the favored local operator from performing the initial processing step" and thus "deprives out-of-state businesses of access to a local market." Id. at 1681. The conclusion that the ordinance affected interstate commerce was, accordingly, inescapable.

Having concluded that the town's ordinance affected interstate commerce, the Court addressed whether its effect was a discriminatory one -- whether it operated to favor local commercial interests or disfavor out-of-state ones.  This was important because a local measure that discriminates against interstate commerce on its face or in effect can be upheld only if it falls within "a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest."  Id. at 1683.  Such protectionist measures are thus subjected to heightened scrutiny as compared with local measures that pursue a legitimate local interest evenhandedly and impose only an incidental burden on interstate commerce.  Nondiscriminatory measures will be upheld unless the incidental "burden on interstate commerce . . . is 'clearly excessive in relation to the putative local benefits.'"  Id. at 1682 (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)).  Because the Court found the "practical effect and design" of the Clarkstown ordinance discriminatory, it held that heightened scrutiny was required and that the Pike balancing test was inappropriate.  See id. at 1684.

Clarkstown's flow control ordinance regulated the local market for solid waste processing services in a protectionist manner.  It allowed only the favored operation to process waste located within the limits of the town and the Court found this "no less discriminatory because in-state or in-town processors are also covered by the prohibition."  Id. at 1682.  In support

of these conclusions, the Court cited Dean Milk Co. v. Madison,
340 U.S. 349 (1951), which involved a dormant Commerce Clause
challenge to a city ordinance requiring that all milk sold in the
city be pasteurized within five miles of the city limits.  The
ordinance was held to be an unjustifiable protectionist measure
because it favored milk processors located within a five-mile
radius.  The Dean Milk court found "immaterial [the fact] that
Wisconsin milk from outside the [local] area [was] subjected to
the same proscription as that moving in interstate commerce."
Dean Milk, 340 U.S. at 354 n.4, quoted in, C & A Carbone, 114
S. Ct. at 1682.

The Clarkstown ordinance was found to be "just one more
instance of local processing requirements that . . . long have
[been] held invalid."  Id. at 1682.  Citing a long line of cases
in which local processing requirements had been stricken, the
Court described the evil there addressed and the evil of
Clarkstown's flow control ordinance as follows:

> The essential vice in laws of this sort is
> that they bar the import of the processing
> service.  Out-of-state meat inspectors, or
> shrimp hullers, or milk pasteurizers, are
> deprived of access to local demand for their
> services.  Put another way, the offending
> local laws hoard a local resource -- be it
> meat, shrimp, or milk -- for the benefit of
> local businesses that treat it.
>
> The flow control ordinance has the same
> design and effect.  It hoards solid waste,
> and the demand to get rid of it, for the
> benefit of the preferred processing facility.
> The only conceivable distinction from the
> cases cited above is that the flow control
> ordinance favors a single local proprietor.
> But this difference just makes the

> protectionist effect of the ordinance more
> acute.  In <u>Dean Milk</u>, the local processing
> requirement at least permitted pasteurizers
> within five miles of the city to compete.  An
> out-of-state pasteurizer who wanted access to
> that market might have built a pasteurizing
> facility within the radius.  The flow control
> ordinance at issue here squelches competition
> in the waste-processing service altogether,
> leaving no room for investment from outside.

114 S. Ct. at 1683.

Having determined that heightened scrutiny rather than interest balancing was appropriate, the Court held that Clarkstown had "any number of nondiscriminatory alternatives for addressing the health and environmental problems alleged to justify the ordinance in question."  <u>Id.</u> at 1683.  In the course of so holding, the Court recognized that the flow control ordinance was adopted by the town as a means of financing the construction of a needed processing facility.  This did not aid the town case, however, because there was a non-discriminatory alternative available:

> Clarkstown maintains that special
> financing is necessary to ensure the long-
> term survival of the designated facility.  If
> so, the town may subsidize the facility
> through general taxes or municipal bonds.
> But having elected to use the open market to
> earn revenues for its project, the town may
> not employ discriminatory regulation to give
> that project an advantage over rival
> businesses from out of State.

114 S. Ct. at 1684 (citation omitted).

B.

New Jersey's flow control regulations accomplish on a district level substantially what Clarkstown's flow control ordinance accomplished on a local level. They favor the district's designated facilities at the expense of out-of-state providers of processing and disposal services that would otherwise compete for the opportunity to service solid waste generated within the district. Here, as in C & A Carbone and Dean Milk, it is immaterial that the designated facilities are favored over other in-state facilities as well as over out-of-state ones. Similarly, it is irrelevant here, as in Dean Milk, that an out-of-state firm willing to build an in-district facility is entitled to compete to have that facility become a designated facility. Like the governmental entities in the other cases involving local processing requirements, New Jersey is regulating a market which the Commerce Clause intended to be open to non-local competitors. More specifically, New Jersey is regulating the market for solid waste processing and disposal services in each of the districts by directing district consumers of those services to utilize a favored service provider who, in the absence of exceptional circumstances, operates a local facility. It necessarily follows, we conclude, that any Commerce Clause analysis of New Jersey's flow control regulations must employ the heightened scrutiny test and that the district court erred by subjecting them only to the balancing test of Pike.[17]

_____

[17]. In applying the Pike test, the district court relied on J. Filiberto Sanitation v. Department of Envtl. Protection, 857 F.2d 913 (3d Cir. 1988). We there found that a requirement that all waste generated in a county be processed at the county's

C.

It is true, as the Department stresses, that New Jersey has not placed an absolute bar on the utilization of out-of-state facilities as designated facilities. This, however, does not transform a fundamentally discriminatory scheme into a non-discriminatory one. While out-of-state facilities can compete to become designated facilities, the Department acknowledges that it approves district plans only if they are consistent with the "core" goal of having all of New Jersey's solid waste processed and disposed of in New Jersey within the next five years. This can be accomplished, and is being accomplished, only by selecting existing and proposed in-state facilities whenever possible. In short, out-of-state facilities do not compete on anything approaching a level playing field. Wyoming v. Oklahoma, 112 S. Ct. 789, 801 (1992) ("The volume of commerce affected measures only the extent of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce.").

In reaching our conclusion that the appropriate Commerce Clause measuring rod is heightened scrutiny, we have not (..continued)
transfer station did not have any effect on interstate commerce because the waste entered the interstate market after processing, and then noted that the rule would have met the Pike test as well. Our holding that the waste flow restriction did not affect interstate commerce is inconsistent with C & A Carbone and is therefore overruled. To the extent Filiberto can be read to authorize the application of the Pike balancing test to New Jersey's waste flow regulations it is also inconsistent with C & A Carbone and is overruled.

been unmindful of the Department's insistence that the public utility aspects of New Jersey's solid waste system distinguish the flow control regulations here from the Clarkstown ordinance. In substance, the Department urges that (1) Clarkstown's transfer station was not a regulated public utility; (2) New Jersey's designated facilities are regulated public utilities; (3) what Atlantic Coast finds objectionable in the waste flow regulations -- the monopoly and resulting captive customer base of the designated facilities -- is inherent in any public utility regulatory scheme; (4) Commerce Clause analysis in the context of state public utility regulation has consistently employed the balancing test of Pike; and (5) state public utility regulation is upheld where, as here, the burdens on commerce are not disproportionate to the local benefits.

While we agree with the Department's first three propositions, we do not read the dormant Commerce Clause jurisprudence to suggest that state utility regulation is to be judged by different standards than other state regulation. When state utility regulation is protectionist, the Supreme Court has employed heightened scrutiny; where it is not, a benefits and burdens analysis has been applied.

In New England Power Co. v. New Hampshire, 455 U.S. 331, 334-36 (1982), the Supreme Court reviewed an order of the New Hampshire Public Utility Commission that required the New England Power Company, a consortium of Connecticut River hydroelectric power companies, to reserve for New Hampshire residents an amount of power equal to the amount generated by the

consortium within that state. The Court found that the Commission's order was essentially an "exportation ban" that placed a direct and substantial burden on interstate commerce and therefore applied the heightened scrutiny test to the discriminatory order. Id. at 339.

Subsequently, in Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission, 461 U.S. 375 (1983), in rejecting an outdated Commerce Clause utility test that focused on whether the state was regulating wholesale or retail sales of gas or electricity, the Supreme Court noted: "Our constitutional review of state utility regulation in related contexts has not treated it as a special province insulated from our general Commerce Clause jurisprudence." Id. at 391 (citing New England Power Co., 455 U.S. 331 (1982)). The Court then articulated the Pike balancing test as "[o]ne recent reformulation of the [Court's dormant Commerce Clause] test" and, after noting that the regulation at issue did not implicate economic protectionism and would involve only an incidental effect on interstate commerce, applied the balancing test to conclude that the regulation did not violate the Commerce Clause. Id. at 393–95.[18] Although the Arkansas Electric Court did not expressly

---

[18]. The issue in Arkansas Electric Cooperative Corp. was whether the Arkansas Public Service Commission had violated the Supremacy or Commerce Clauses by asserting regulatory jurisdiction over the wholesale rates that the cooperative charged to its retail members, all of whom were located within the state. Wholesale rates charged by cooperatives was one area of wholesale electricity sales that the federal legislation and rules did not govern. See 461 U.S. at 377, 381–82.

characterize the regulation before it as non-discriminatory, the Court's opinion can only be read as implicitly rejecting application of the heightened scrutiny test because it found no discrimination against interstate commerce.

More recently, the Supreme Court applied the heightened scrutiny test to protectionist state public utility regulation in Wyoming v. Oklahoma, 112 S. Ct. 789 (1992). The state statute there under attack required that all coal-fired electricity plants located within the state of Oklahoma burn at least ten percent Oklahoma mined coal. The Court concluded that the statute discriminated against interstate commerce and struck it down under the dormant Commerce Clause, noting that the question of which level of scrutiny to apply to the protectionist measure was "not a close call." Id. at 800 n.12.

Based on this Supreme Court case law, we reject the Department's contention that because the waste flow regulations are part of a larger utility regulation system, they are not subject to the heightened scrutiny test despite any discriminatory effect.

We have found only one Supreme Court case in which a Commerce Clause challenge was made based on the exclusionary effects of a monopoly created by a state public utility regulatory scheme. In that case, Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, 341 U.S. 329 (1951), the Court sustained the state utility commission's refusal to allow an out-of-state natural gas supplier to sell natural gas to industrial consumers in an area where a Michigan public utility

had been granted an exclusive certificate of public convenience and necessity. Panhandle is not helpful here, however, because it was decided before Arkansas Electric. As we have noted, the Court there rejected the bright line test of cases like Public Utilities Commission v. Attleboro Steam & Electric Co., 273 U.S. 83 (1927), and Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179 (1950), that regarded state regulation of wholesale utility markets as a direct burden on interstate commerce and state regulation of retail utility markets as "essentially local" in nature and as having only an incidental effect on interstate commerce. The Court in Panhandle Eastern sustained the local gas company's monopoly on the authority of Cities Service and the wholesale/retail distinction there reflected.

Now that the Supreme Court has rejected this distinction and made it clear in Arkansas Electric that public utilities regulation is not a special category for Commerce Clause purposes, it well may be that the heightened scrutiny test would be applied to a situation like that presented in Panhandle Eastern where an out-of-state firm challenges its exclusion from the local franchise market. A strong argument can be made that the rationale in C & A Carbone would require use of this test. See 114 S. Ct. at 1682 (finding the ordinance discriminatory because "it allows only the favored operator to process waste that is within the limits of the town" and "no less discriminatory because in-state or in-town processors are also covered by the prohibition"). We do not suggest, however, that traditional public utilities regulation of retail sales would be

invalidated by heightened scrutiny. Where the regulation is addressed to a utility, like a local gas utility and unlike Atlantic Coast, whose service requires a tangible distribution system, a franchise monopoly may be the only economically feasible alternative.

We note that there is a discriminatory aspect to the waste flow control regulations in the context of New Jersey's scheme that is not present in a situation like that presented in Panhandle Eastern. A gas or electric utility granted a franchise to serve the needs of all residents within a local area is not ordinarily required to commit to producing its electricity or securing its natural gas supply within that area as well. Normally, both in-state and out-of-state interests may, therefore, compete equally for the franchise award and the creation of a captive consumer base does not, under these circumstances, discriminate against electricity and gas generated or produced out of state.

Under New Jersey's system, collectors of waste -- those who supply disposal services at the retail level -- are required to secure processing and disposal services from the designated, franchised facility and out-of-state disposal firms are thus excluded not only from the market for such services during the franchise period but also from competing for the franchise. The burden on the flow of services from out of state in the situation now before us is thus far greater than the burden on the flow of electricity and gas from out-of-state in the traditional public utility regulation situation.

We thus conclude that the public utility aspects of New Jersey's solid waste disposal scheme do not require application of the Pike balancing test.

IV.

As an alternative to its argument that the nature of the New Jersey waste disposal scheme distinguishes it from the ordinance in C & A Carbone and requires that its waste flow regulations be subject to a more lenient level of scrutiny, the Department contends that the nature of the system earns the regulations the protection of the market participant doctrine. The Supreme Court has recognized what amounts to an exception from the restraints of the dormant Commerce Clause for otherwise discriminatory action taken by a governmental entity in its role as a market participant, rather than as a market regulator. The market participant doctrine "differentiates between a State's acting in its distinctive governmental capacity, and a State's acting in the more general capacity of a market participant." New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 277 (1988). When a governmental entity enters the market place in a capacity analogous to that of private market participants and makes decisions analogous to those made by private market participants, its decisions are not subject to dormant Commerce Clause scrutiny. Thus, "'[t]he Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace, but only action of that description in connection with the State's regulation of interstate commerce.'" Oregon

<u>Waste Systems v. Department of Environmental Quality</u>, 114 S. Ct. 1345, 1354 n.9 (1994) (quoting <u>New Energy Co. of Indiana v. Limbach</u>, 486 U.S. 269, 278 (1988)).

The Supreme Court has found the market participant doctrine to be applicable in only three cases: <u>Hughes v. Alexandria Scrap</u>, 426 U.S. 794, 808-09, 810 (1976) (upholding a program involving payments by a state for auto scrap where the payments were restricted to in-state processors for state-titled vehicles); <u>Reeves, Inc. v. Stake</u>, 447 U.S. 429 (1980) (sustaining a restriction on the sale of government-produced cement to state residents); and <u>White v. Massachusetts Council of Construction Workers, Inc.</u>, 460 U.S. 204 (1983) (upholding an executive order requiring that city residents comprise at least one-half the staff of all public works construction projects funded in whole or part by city funds or city-administered federal funds). Two important characteristics tie these three cases together. In each situation the government was participating directly in some aspect of the market as a purchaser, seller, or producer, and the alleged discriminatory effects on the interstate market flowed from these market actions.

In the solid waste arena, the Supreme Court has not yet reviewed a case involving a government-owned waste facility and the Court has consequently left unanswered the question as to what effect government ownership of a waste facility would have on otherwise discriminatory waste measures. <u>See</u> <u>City of Philadelphia v. New Jersey</u>, 437 U.S. at 627 n.6 (reserving the question whether a governmental unit who operates a landfill is a

market participant); <u>Oregon Waste Systems</u>, 114 S. Ct. at 1354 n.9 (finding impermissibly discriminatory a state statute directing private landfills to pass on a mandated surcharge on out-of-state generated waste and declining to address the issue whether Oregon could accomplish its "cost-spreading" through market participation).  This court, however, has applied the market participant doctrine in the context of a publicly owned waste disposal facility.  In <u>Swin Resource Systems, Inc. v. Lycoming County</u>, 883 F.2d 245, 250 (3d Cir. 1989), <u>cert. denied</u>, 493 U.S. 1077 (1990), we held that the local government did not violate the dormant Commerce Clause by charging at the county-operated landfill a higher disposal fee for waste generated outside a local area than for locally-generated waste, stating:

> If Maryland may decree that only those with Maryland auto hulks will receive state bounties, it would seem that Lycoming can similarly decree that only local trash will be disposed of in its landfill on favorable terms. If South Dakota may give preference to local concrete buyers when a severe shortage makes that resource scarce, it would seem that Lycoming may similarly give preference to local garbage (and hence local garbage-producing residents) when a shortage of disposal sites makes landfills scarce. And if Boston may limit jobs to local residents, we see no reason why Lycoming may not limit preferential use of its landfill to local garbage (and hence local garbage-producing residents).

Swin Resource Systems, 883 F.2d at 250 (footnote omitted). We held that the county, rather than regulating the waste disposal market, was "deciding the conditions under which [a private waste processor] could use [the public] landfill." Id. at 249. The county was simply operating a government facility in a manner that favored its own citizens over others, and its activities did not have "downstream" effects.[19]

The Department argues that the market participant doctrine is applicable here because New Jersey participates (or directs local government entities to participate) in the waste disposal market as sellers and purchasers of waste disposal

---

[19]. In South-Central Timber Dev. v. Wunnicke, 467 U.S. 82 (1984), a four-justice plurality held that the market participant doctrine did not apply to an Alaska regulation requiring in-state processing of timber obtained by private companies from state forest land because it had the effect of controlling aspects of the timber market in which the government, acting as a timber seller, did not participant. 467 U.S. at 97-99 (opinion of White, J.). The regulation was thus seen as having impermissible "downstream" effects.

services and disposal capacity. The districts "sell" waste disposal services, according to the Department, through the designated disposal facilities. Where a district has opted not to own or operate the designated facilities directly, it "purchases" these services for "resale" by contracting with private facilities for the provision of waste disposal services. Thus, the Department maintains, the waste flow regulations simply represent a means by which the state manages the districts' market participation and the regulations are therefore protected from Commerce Clause scrutiny under the market participant doctrine.

While we do not quarrel with the Department's characterization of the districts' activities as involving purchases and sales of disposal service and capacity, we cannot agree with its conclusion that the waste flow regulations, therefore, cannot be violative of the dormant Commerce Clause. When a public entity participates in a market, it may sell and buy what it chooses, to or from whom it chooses, on terms of its choice; its market participation does not, however, confer upon it the right to use its regulatory power to control the actions of others in that market. In Wyoming v. Oklahoma, 502 U.S. 437 (1992), for example, an Oklahoma statute required all electrical utilities in the state, including state-owned utilities, to burn a mixture of coal containing at least ten percent Oklahoma-mined coal. The Court recognized that Oklahoma could legitimately impose this restriction on state-owned utilities because, as a market participant, it was entitled to make its own decisions

regarding energy source purchases. That fact did not, however, immunize from dormant Commerce Clause review its attempt to regulate the behavior of others in the market. As we have earlier noted, the Court applied heightened scrutiny and found the statute invalid.[20] Oklahoma's participation in the market as an electricity producer did not permit it to regulate in a discriminatory manner privately owned utilities in the same market.

Under New Jersey's solid waste disposal program, the districts are doing more than making choices about what waste they will accept even in those instances where the district owns the designated facility. The waste flow regulations purport to control the market activities of private market participants. Those regulations do not concern only the manner of operation of the government-owned or government-managed designated disposal facilities; they require everyone involved in waste collection and transportation to bring all waste collected in the district to the designated facilities for processing and disposal. They do not merely determine the manner or conditions under which the government will provide a service, they require all participants in the market to purchase the government service--even when a

---

[20]. The Court refused to uphold that portion of the statute that applied specifically to the state-owned utility after determining that it could not be severed from the remaining provisions. Wyoming, 112 S. Ct. at 802-04. In so doing, the Court stated: "We leave to the Oklahoma Legislature to decide whether it wishes to burden this state-owned utility when private utilities will otherwise be free of the Act's restrictions." Id. at 804.

better price can be obtained on the open market.  New Jersey's waste flow control regulations were thus promulgated by it in its role as a market regulator, not in its capacity as a market participant.  As a result, those regulations are not immune from review under the Commerce Clause.

V.

Because we conclude that the waste flow regulations discriminate against interstate commerce on their face or in effect, and that they are not protected from dormant Commerce Clause scrutiny under the market participant exception, the only remaining question is whether the regulations can survive the heightened scrutiny test.  "[O]nce a state law is shown to discriminate against interstate commerce either on its face or in practical effect, the burden falls on the State to demonstrate both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means."  Maine v. Taylor, 477 U.S. 121, 138 (1986) (internal quotations and citation omitted).  While Atlantic Coast urges us to decide whether the Department has so demonstrated, we decline to do so.

When the district court decided this case, C & A Carbone had not been decided and J. Filiberto Sanitation v. Department of Environmental Protection, 857 F.2d 913 (3d Cir. 1988), was the law of this circuit.  Understandably relying on Filiberto, the district court balanced the benefits to New Jersey against the burden on interstate commerce under Pike.  It

therefore had no occasion to consider whether the Department had accomplished the much more onerous task of demonstrating that there is no alternative to its waste flow control regulations that would accomplish its legitimate objectives.

The parties compiled a very substantial record in the district court, much of which consisted of live testimony the district court had the benefit of hearing. Based on that record, it is not difficult to believe the Department and the amici when they insist that New Jersey has one of the most serious and complex solid waste problems in the country. At the same time, it is apparent from the record that the feasibility and effectiveness of alternative measures pose technologically and economically complex issues. While these issues have been touched upon in the briefing before us, it is fair to say that they have not been the focus of the parties' efforts on this appeal.[21] In this context, we believe that this court, the parties, and the public deserve the benefit of the district court's views before this controversy is finally resolved.

We are mindful of the fact that New Jersey has vowed not to abandon its present system until compelled to do so and of Atlantic Coast's contention that it suffers more irreparable

---

[21]. The district court is in a far better position than we to evaluate whether the focus of the efforts of the parties before it would have been substantially the same had C & A Carbone been earlier decided. Accordingly, we leave it to the discretion of the district court in the first instance whether to resolve the remaining issues, including the issue of the appropriate form of relief if relief is to be granted, on the basis of the current record or to reopen the record for supplementary evidence.

injury with each passing month.  We note, however, that Atlantic Coast is free at any time to apply again for pendente lite relief.  The district court's prior decision to deny such relief was based primarily on its conclusion that Atlantic Coast had failed to demonstrate a likelihood of success on the merits of its challenge.  This conclusion was based in turn on its view that the more lenient Pike test was the applicable one.  After C & A Carbone, the likelihood of success issue is a materially different one from that which the district court previously addressed.

## VI.

Because the waste flow regulations discriminate against interstate commerce by restricting the access of out-of-state facilities to waste processing and disposal service markets, they can be upheld only if they can survive the heightened scrutiny required by C & A Carbone.  Because the district court analyzed the waste flow regulations under the more lenient Pike balancing test, we will remand for application of the appropriate test. For the foregoing reasons, the district court's judgment in favor of the Department will be reversed and this case will be remanded for further proceeding consistent with this opinion.