## PELICAN CHAPTER, ASSOCIATED BUILDERS & CONTRACTORS, INC., et al.

v.

## Honorable Edwin W. EDWARDS, et al.

### Civ. A. No. 92–481–A.

United States District Court,
M.D. Louisiana.

Oct. 3, 1995.

---

Murphy J. Foster, III, Victor A. Sachse, III, Breazeale, Sachse & Wilson, Baton Rouge, for plaintiffs.

Susan L. Dunham, Daryl K. Manning, Louisiana Dept. of Economic Development, Baton Rouge, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

### INTRODUCTION

Plaintiffs brought this action for declaratory judgment and injunctive relief, seeking a declaration that the manner in which a state tax exemption program is administered constitutes discrimination against interstate commerce, and an injunction preventing the defendants from enforcing this allegedly discriminating scheme.

Plaintiffs are Pelican Chapter, Associated Builders and Contractors, Inc. ("Pelican"), [an association of contractors], and three of its member contractors: Harmony Corporation, Cajun Contractors, Inc., and Austin Industrial, Inc. ("The Contractors"). All of the member contractors engage in the construction of industrial plants in interstate commerce. As originally filed, the complaint also included six individual plaintiffs who were not residents of Louisiana, and who were alleged to be construction workers prohibited by the regulation in question from pursuing their livelihood. On February 2, 1995, the individual plaintiffs were all voluntarily dismissed. Thus, the only remaining plaintiffs are Pelican and the three member contractors.

Defendants are Edwin W. Edwards, in his official capacity as Governor of Louisiana, Kevin P. Reilly, in his official capacity as Secretary of the Department of Economic Development, and K. Don Pilgreen, in his official capacity as Chairman of the Louisiana Board of Commerce and Industry (the "Board").

### Background

The state of Louisiana grants a limited ad valorem tax exemption to the owners of "new manufacturing establishment[s]" and those who build additions to existing manufacturing establishments. The Board, which administers the tax exemption program, has adopted a formal rule mandating a preference for Louisiana materials, labor, and suppliers in the construction of all projects for which an exemption is granted. The Board has established an informal policy by which it judges compliance with the local preference rule. Under the policy, contractors and subcontractors who work on tax exempt projects must maintain a work force of at least eighty percent (80%) Louisiana residents, and use at least 80% Louisiana materials, to ensure compliance with the rule. Failure by the contractor to meet the standard could result in a denial or reduction of the tax exemption to the plant owner.

For reasons which follow the court ultimately holds that the plaintiffs, as contractors, have standing to challenge the administration of the tax exemption program, that enforcement of the hiring restriction constitutes discrimination against interstate commerce and that such discrimination is prohibited by the Commerce Clause of the Constitution.

### FINDINGS OF FACT

1. Article VII, Section 21(F), of the 1974 Louisiana Constitution[1] provides that "... [T]he State Board of Commerce and Industry ..., with the approval of the governor, may enter into contracts for the exemption from ad valorem taxes of a new manufacturing establishment or an addition to an existing manufacturing establishment, on such terms and conditions as the board, with the approval of the governor, deems in the best interest of the state."

2. The Constitution further limits the exemption to an initial term of "no more than five calendar years" which may be renewed for an additional five years. The exemption extends to buildings, machinery and equip-

1. A similar provision, § 4.1 of article 10, was included in the Louisiana Constitution of 1921.

ment, but not to the land upon which the plant or plant addition is constructed.

3. Among the "terms and conditions" which the Board has deemed in the best interest of the state is Rule One which the Board has adopted. That rule provides, in part:

"The Board of Commerce and Industry requires manufactures [sic] **and their contractors** to give preference and priority to Louisiana manufactures [sic] and, in the absence of Louisiana manufacturers, to Louisiana suppliers, contractors **and labor** except where not reasonably possible to do so without added expense or substantial inconvenience or sacrifice in operating efficiency.... It is a legal and moral obligation of the manufacturers receiving exemptions to favor Louisiana manufacturers, suppliers, contractors and labor, all other factors being equal." (Emphasis supplied)

The parties have stipulated the following facts and the court accepts them as established facts:

4. Rule One of the Louisiana Board of Commerce and Industry ("the Board") has long required favoring employment of Louisiana residents by contractors and subcontractors on industrial construction and improvement projects affected by the Industrial Tax Exemption Program administered by the Board.

5. In 1983, the Board, without adopting a formal rule, implemented a [sic] 80% policy relative to employment of Louisiana law [sic labor]. The 80% Policy has been used as a benchmark or a "trigger" whereby if the Board or the Department of Economic Development conducted a background investigation and there was 80% or more labor from Louisiana, the Board would generally assume that the company did the best job it could in hiring Louisiana workers. If it was below 80%, the Board asks the company to explain what efforts were made to hire Louisiana workers.

6. The Associated Builders and Contractors and several of its members challenged Rule One, particularly its residency hiring restrictions in a rule making hearing and later before the entire Board. The Board refused to alter its policies regarding either Rule One or any part of its residency hiring restrictions.

7. The 80% benchmark residency hiring restrictions of Rule One was a policy adopted by the Board in 1983. It has never been formally adopted as a rule pursuant to Louisiana Administrative Procedures Act and the rule making powers of the Board or the Department of Economic Development.

8. From the standpoint of the Board and the Department of Economic Development, there is no practical difference from the way it applies a policy as opposed to a formal rule.

9. Rule One contains restrictions for the hiring of Louisiana labor, as well as use of Louisiana contractors and engineers and other Louisiana resources as well. If Louisiana resources are available at the best price, all other factors being equal, then Rule One requires that recipients of the tax exemption use the Louisiana contractor, engineer, labor or other resources and that the recipient contractors do the same.

10. The residency hiring restrictions of Rule One have been used in the past to limit or restrict the industrial tax exemption otherwise available.

11. Typically, complaints concerning Rule One involving the failure to use Louisiana labor are received and investigated after most of the construction on the subject project has concluded.

12. There has never been a study or analysis of the benefits to the State of Louisiana of the administration and enforcement of Rule One or of its residency hiring restrictions.

13. There has never been a study or an analysis which has shown that by having and enforcing Rule One and its residency hiring restrictions, there is less unemployment in Louisiana.

14. There is no empirical data whatsoever to show that the imposition, administration and enforcement of Rule One and its residency hiring restrictions have served to increase employment and decrease unemployment in

Louisiana among Louisiana workers or Louisiana contractors.

15. There exist [sic] no evidence or empirical data to show that more Louisiana workers are hired by the imposition or the residency hiring restrictions of Rule One or that the unemployment rate has in any way been effected positively or negatively by the administration and enforcement of the residency hiring restriction of Rule One.

16. Rule One has been applied by the Department of Economic Development and the Board in a manner so as to require applicants to prefer or show preference to Louisiana suppliers, Louisiana contractors and Louisiana labor over non-residents suppliers, contractors and laborers.

17. No where in the documentation provided to any applicant for industrial tax exemption is the applicant informed that there is an 80% benchmark or trigger for residency hiring. It is not until and unless an investigation is commenced or inquiry is made that an applicant would learn that it was its obligation to ensure that at least 80% of the labor working on its construction project were from Louisiana.

18. In the investigations conducted by the Louisiana Department of Economic Development pursuant to Rule One and its residency hiring restrictions, investigators inquire as to whether the recipient or their contractors are making a reasonable effort to hire Louisiana workers.

19. If the Board concludes that an applicant for an industrial tax exemption has not made a reasonable effort to retain Louisiana contractors or that it or its contractors have not made a reasonable effort to hire Louisiana labor, then the Board will consider a restriction or limitation of all or a portion of the industrial tax exemption applied for.

20. It is the policy of the Department of Economic Development and the Board that it is the responsibility of the applicant seeking the industrial tax exemption to abide by Rule One and that such applicants should pass the word down through their contractors and through their subcontractors that the Board and the Department of Economic Develop-

ment expects Louisiana resources to be given an opportunity either to bid or to work.

21. According to the Board and the Department of Economic Development, it is the responsibility of the applicant seeking the exemption to abide by Rule One and, in most cases, the applicant advises contractors, subcontractors, etc., to do likewise because obviously, it could cost them money if they don't.

22. The Board and the Department of Economic Development consider the residency hiring restrictions of Rule One an obligation of the contractor of the recipient and not just an obligation of the recipient.

23. If a contractor of a recipient of an industrial tax exemption is found to be in violation of the residency hiring restrictions of Rule One because that contractor is perceived to have not made a reasonable effort to use in Louisiana labor, such would be reflected in the exemption or the limitation of exemption for the applicant.

24. Because Rule One requires manufacturers "and their contractors" to give preference to Louisiana contractors and labor, it is the policy of the Board that Rule One also applies to contractors of the applicants. Thus, if a contractor violates Rule One, then it is going to reflect on the applicant's status and whether or not the applicant receives the full tax exemption or has such limited.

25. The Board and the Department of Economic Development have continued to investigate complaints alleging violation of the residency hiring restrictions of Rule One for the purpose of reporting any perceived violations to the Board.

The court makes the following additional findings of fact:

26. Manufacturers rarely construct their own plants or significant additions; virtually all such work is contracted out to contractors such as plaintiffs.

27. Plant owners routinely require that the contractor-builder enter a formal indemnity agreement covering any loss or reduction of tax exemption which the owner might sustain as a result of the contractor's or subcontractor's non-compliance with Rule One.

28. Forms furnished by the Board to applicants for the tax exemption suggest such indemnity agreements.

29. Since no tax exemption is granted until a project is essentially completed and since industrial plant construction frequently extends over long periods of time, it is not possible for the owner or the contractor to know in advance the amount of any such tax exemption or the amount of any loss or reduction of the tax exemption because of non-compliance with Rule One.

30. This risk of "pass through liability" to the contractor cannot be covered by insurance; no insurer will underwrite such a risk.

31. Contractors on tax exempt work in Louisiana must assume the uninsured risks themselves or they must decline to perform construction projects which may become eligible for the tax exemption.

32. Each of the plaintiff contractors is or has been extensively engaged in tax exempt construction projects in Louisiana; each also does construction work in other states.

33. Contractors incur administrative costs in complying with Rule One and are required by the Board to maintain personnel records for post completion audit purposes.

34. Compliance with Rule One causes inefficiency because contractors, fearful of dropping below the "eighty percent" policy cannot utilize experienced long-term employees who reside in other states. This is particularly a problem for contractors operating in the western part of the state near the Texas line.

35. In some cases contractors are unable to utilize cost-efficient, competent, experienced, out-of-state subcontractors because of fear of non-compliance with Rule One.

36. Because the Board has not consistently applied a definition of "Louisiana resident" and because the audit process may occur long after completion of the project, contractors tend to hire more Louisiana residents, thus excluding more out-of-state employees.

37. A summary submitted by defendants indicates that in the administration of the industrial tax exemption program and its predecessors from 1936 through 1993, Louisiana has granted a total of 15,369 tax exemptions, totaling 4 billion dollars on projects costing 44.5 billion dollars.

## CONCLUSIONS OF LAW

### SUBJECT MATTER JURISDICTION

■ This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the Constitution of the United States. The Supreme Court has now resolved the dispute as to whether rights arising under the Commerce Clause are included within the "rights, privileges or immunities secured by the Constitution and laws" referred to by the text of 42 U.S.C. § 1983. They are included. See *Dennis v. Higgins,* 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991); see also *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989). Since these plaintiffs claim that the enforcement of Rule One deprives them of rights secured by the Commerce Clause of the Constitution, this court has subject matter jurisdiction.

### STANDING TO SUE

The tax exemption authorized by Section 21(F) of Article VII of the Louisiana Constitution is granted, not to the plaintiff contractors, but to the owners of "manufacturing establishments". Accordingly, the defendants have insisted throughout this litigation that these contractors have no standing to attack this program, which has as its declared purpose reducing Louisiana's historically high rate of unemployment. Plaintiffs actually do not attack the tax exemption; they attack Rule One which has been adopted by the Board. The defendants point out that there is no privity of contract between the contractors and the state and argue that the contractors' voluntary assumption of "pass through" liability is wholly between them and the plant owners with whom they contract.

This court has previously held, based upon the allegations of the third amended complaint, that the plaintiff contractors do have standing to challenge the state action. See ruling dated January 28, 1993. The court

now holds that based upon the evidence presented, plaintiff contractors proved their standing to attack the administration of the tax exemption program, specifically Rule One.

■ In *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Court commented that:

"Over the years our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally-protected interest which is (a) concrete and particularized ... and (b) 'actual or imminent, not "conjectural" or "hypothetical" ...' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' ... Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" [504 U.S. at 559] 112 S.Ct. at 2136. (citations omitted).

■ It is clear that a party asserting a right under the Commerce Clause to engage in interstate commerce free of discriminatory taxes or penalties is within the "zone of interests" protected by the Commerce Clause. See *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

### Injury in Fact

■ Despite the fact that these plaintiff-contractors have no direct contractual relationship with the state of Louisiana, the record establishes that they are suffering indirect injury as a result of the enforcement of Rule One. Admittedly they can decline to enter an indemnity agreement with the owner of a manufacturing establishment and thus avoid the "pass through" risk of liability. Their business is, however, construction of manufacturing establishments, thus, the plaintiff contractors must either assume the risk of liability or give up a significant por-

tion of their interstate business. The fact that their injury is an indirect result of the enforcement of Rule One does not deprive them of standing to vindicate their rights. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

As noted in the findings of fact, Rule One itself provides that "The Board ... requires manufactures[sic] *and their contractors* to" comply with the hiring preference. In enforcement of its policy, the Board audits contractors, not manufacturers. The Board itself suggests to manufacturers that they enter indemnity agreements with their contractors, even suggesting specific language. The contractors incur additional costs in complying with the state policy both in record keeping and in reduction in efficiency because of their inability to use out-of-state workers and subcontractors.

This record is clear that the plaintiff contractors have suffered and will continue to suffer injury in fact which is concrete and not conjectural.

### Causal Connection

■ The second prong of the standing test requires that the plaintiffs show facts which link the injury of which they complain to the conduct of the defendants. It is clear that the defendants in this action enforce the state policy embodied in Rule One which is the cause of the injury about which the plaintiff contractors complain.

### Readdressability

The final element of the standing test requires the plaintiffs to show that the injury will be redressed by a decision in their favor. A permanent injunction restraining the defendants from enforcing Rule One will certainly remove the cause of their injury.

Accordingly, the court again concludes that plaintiffs, as contractors, have standing to bring this action for the purpose of enjoining the enforcement of Rule One.

## DISCUSSION OF THE MERITS

### The Privileges and Immunities Clause

■ The plaintiffs have continued to cite and rely upon jurisprudence relating to the

Privileges and Immunities Clause (Const. Art. IV, Sec. 2, "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States") despite the fact that all the individual construction worker plaintiffs have been dismissed from this litigation. Since Pelican and all the plaintiff contractors are corporations, they may not assert claims under the Privileges and Immunities Clause. In *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1868), the Supreme Court held that corporations are not citizens within the meaning of that clause of the Constitution, holding that the term "citizen" applies only to natural persons. The Court has reiterated that holding several times. See e.g. *Blake v. McClung,* 172 U.S. 239, 19 S.Ct. 165, 43 L.Ed. 432 (1898), *Williams v. Mayor and City Council of Baltimore,* 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 (1933). Since the plaintiffs are not "citizens" under that clause according to current Supreme Court teaching, their reliance upon cases such as *Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), the "Alaska hire" case, is misplaced. In that case the Court struck down a state requirement that qualified Alaska residents be hired in preference to nonresidents on all oil and gas contracts to which the state was a party. Significantly, the plaintiffs in *Hicklin* were individual nonresident workers, not corporate contractors and the Court analyzed the hiring restriction under Privileges and Immunities Clause principles, not Commerce Clause principles. As noted previously, no individual workers remain in this litigation and under current Supreme Court doctrine, the corporate plaintiffs are not "citizens" and thus lack standing to assert that argument. The court

will, accordingly, limit its analysis to Commerce Clause issues.

### The Commerce Clause

■ The task of the Commerce Clause is to create an open and efficient interstate market.[2] At first glance, the Commerce Clause is an affirmative grant of power. It assigns to the Congress the power "to regulate Commerce with foreign Nations, and among the several States...."[3] Additionally, the clause is prohibitory: without authorization from the Congress, "[T]he Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate] commerce."[4] This negative aspect of the Commerce Clause shelters interstate commerce from protectionism by the states, preserving a unified interstate market.[5]

■ The "negative" or "dormant" Commerce Clause is a limitation on state power.[6] It does not wholly prohibit the states from acting in a way that affects interstate commerce: for example, in the absence of congressional action, states may tax to support their governments even though the tax has an impact on interstate commerce.[7] States are free to provide direct subsidies to their citizens, or to act as market participants.[8] Thus, it is the function of the courts to evaluate in each individual case the national interest in a unified interstate market and the interest of the states in promoting their local industries through legitimate means.[9]

■ To determine whether a state has exceeded the constitutional limits imposed by the negative commerce clause, a court should begin by distinguishing inciden-

---

2. *Boston Stock Exch. v. State Tax Com'n,* 429 U.S. 318, 328, 97 S.Ct. 599, 606, 50 L.Ed.2d 514 (1977).

3. U.S. Const. art. I, § 8, cl. 3.

4. *South–Central Timber Development, Inc. v. Wunnicke,* 467 U.S. 82, 86, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984), See also *Oklahoma Tax Com'n v. Jefferson Lines, Inc.,* —— U.S. ——, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995).

5. *Hughes v. Oklahoma,* 441 U.S. 322, 325–326, 99 S.Ct. 1727, 1730–1731, 60 L.Ed.2d 250 (1979).

6. *Quill Corp. v. North Dakota by and Through Heitkamp,* 504 U.S. 298, 309, 112 S.Ct. 1904, 1911, 119 L.Ed.2d 91 (1992).

7. *Western Live Stock v. Bureau of Revenue,* 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823 (1938).

8. *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 810, 96 S.Ct. 2488, 2498, 49 L.Ed.2d 220 (1976).

9. *Westinghouse Elec. Corp. v. Tully,* 466 U.S. 388, 403, 104 S.Ct. 1856, 1865, 80 L.Ed.2d 388 (1984).

tal intrusion on interstate commerce from active discrimination. As the Court has stated, "The commerce clause, by its own force, prohibits discrimination against interstate commerce, whatever its form or method. . . ." [10] A state actively discriminates against interstate commerce if the discrimination is intentional, where the state action has discriminatory effect,[11] or where the state utilizes discriminatory means.[12] The amount of discrimination is irrelevant; there is no "de minimis" exception.[13]

■ Where a rule or statute actively discriminates against interstate commerce, a "per se" rule of invalidity is applied,[14] "whatever its form or method." [15]

■ Where state action incidentally intrudes on interstate commerce, without utilizing discriminatory means or resulting in discriminatory effect, such action will be constitutional unless the burden imposed by the action is clearly excessive in relation to the local benefits.[16]

## ANALYSIS

■ Rule One clearly intentionally discriminates against interstate commerce. The rule is an attempt by the state of Louisiana to block or regulate the flow of commerce into the state which is prohibited by cases such as *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935). It intends to favor Louisiana materials and labor over out-of-state competition. In *Bacchus Imports, Ltd. v. Dias,*[17] the Supreme Court rejected Hawaii's argument that a questionable tax exemption program was constitutional because it was intended to promote local industry rather than discriminate against foreign products, saying:

> If we were to accept that justification, we would have little occasion ever to find a statute unconstitutionally discriminatory. Virtually every discriminatory statute allocates benefits or burdens unequally; each can be viewed as conferring a benefit on one party and a detriment on the other, in either an absolute or relative sense. . . . [I]t is irrelevant to the Commerce Clause inquiry that the motivation of the legislature was the desire to aid the makers of the locally produced beverage rather than to harm out of state producers.[18]

Rule One uses discriminatory means. It attempts to meet the stated goal of reducing unemployment [19] in Louisiana by creating a program which penalizes contractors or subcontractors for not using Louisiana products and labor. The state could constitutionally induce owners of industrial plants, contractors, and subcontractors to favor Louisiana products and labor through positive incentives such as subsidies or better training and education for Louisiana citizens, but that is not the route the Board has chosen.

Rule One has a discriminatory effect. Lane Grisby, Chairman of the Board of Directors of Cajun Contractors, testified that solely because of Rule One, his company will not hire a laborer or subcontractor who is

**10.** *South Carolina State Highway Dept. v. Barnwell Bros.,* 303 U.S. 177, 185, 58 S.Ct. 510, 514, 82 L.Ed. 734 (1938).

**11.** *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 269, 104 S.Ct. 3049, 3054, 82 L.Ed.2d 200 (1984).

**12.** *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978).

**13.** *Wyoming v. Oklahoma,* 502 U.S. 437, 455, 112 S.Ct. 789, 801, 117 L.Ed.2d 1 (1992).

**14.** *Wyoming v. Oklahoma,* 502 U.S. at 454, 112 S.Ct. at 800.

**15.** *South Carolina State Highway Dept. v. Barnwell Bros.,* 303 U.S. 177, 185, 58 S.Ct. 510, 514, 82 L.Ed. 734 (1938).

**16.** *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

**17.** *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 272, 104 S.Ct. 3049, 3056, 82 L.Ed.2d 200 (1984).

**18.** *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 272, 104 S.Ct. 3049, 3056

**19.** The parties have stipulated that there is no data to demonstrate that the enforcement of Louisiana's hire policy has actually decreased unemployment. Indeed the evidence submitted by defendants indicates that Louisiana continues to lag behind her neighboring states. In this court's view even a successful state program could not justify the discrimination against interstate commerce represented by Rule One.

not a Louisiana resident or use long term employees who live in Texas on projects in Louisiana. Additionally, he testified that he cannot bring in cost effective subcontractors from out of state. Ron McCall, Senior Vice President of Turner Industries, testified that because of Rule One, Turner Industries will only recruit new employees from Louisiana.

The defendants argue that Rule One permits contractors to use out-of-state goods or employ non-resident laborers if the contractor could not reasonably use Louisiana products or laborers for the same price; in other words, according to defendants, Louisiana materials and labor are favored, if equal, but they are not required. The burden of establishing that Louisiana products and workers are "not equal" rests, of course, upon the contractor who may, long after completion of a project discover that the Board of Commerce and Industry disagrees with him as to the residence of former employees. The amount of discrimination, however, is irrelevant. This state policy discriminates against interstate commerce.[20]

## MARKET PARTICIPANT [21]

The defendants strenuously argue that by reason of the industrial tax exemption program, Louisiana becomes a market participant in the industrial plant construction market. They offer evidence that in 57 years Louisiana's tax exemptions have amounted to a total of 4 billion dollars on projects costing 44.5 billion dollars and argue that Louisiana is funding, in part, the cost of such projects. The defendants then seek the protection of the umbrella afforded when the state is a "market participant" as set forth particularly in cases such as *White v. Massachusetts Council of Const. Employers*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), where a local hiring requirement was sustained against a dormant Commerce Clause challenge.

Beginning with *Hughes v. Alexandria Scrap Corp.*,[22] the Supreme Court has articulated the doctrine that a state, when acting as a market participant rather than a market regulator, is not subject to the restrictions of the dormant Commerce Clause. ("Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." 426 U.S. at 794, 96 S.Ct. at 2488.)

There the state of Maryland was held to be a market participant because it offered bounties for the purchase of automobile hulks, and thus could treat Maryland citizens more favorably than others. The doctrine was further explained by the Court in *Reeves, Inc. v. Stake* [23] where the state of South Dakota owned and operated a cement plant and sought to confine sales to state residents during a cement shortage. In holding that the Commerce Clause simply has no application to such state activities, the Court commented:

> The basic distinction drawn in *Alexandria Scrap* [426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976)] between States as market participants and States as market regulators makes good sense and sound law. As that case explains, the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace.... There is no indication of a con-

**20.** *West Lynn Creamery, Inc. v. Healy*, —— U.S. ——, ——————, 114 S.Ct. 2205, 2217–2218, 129 L.Ed.2d 157 (1994).

**21.** The continued viability of this doctrine is questionable in light of *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), where the Court overruled *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). *Garcia* specifically rejects the "sovereign/proprietary" state function theory upon which market participant rests. See *Swin Resource Systems, Inc. v. Lycoming County*, 883 F.2d 245, 257–262 (3d Cir.1989), (Gibbons, Chief

Judge, Dissenting); see also Manheim, New Age Federalism and the Market Participant Doctrine, 22 Ariz.St.L.J. 559. An interesting casenote, Home–State Preferences In Public Contracting: A Study in Economic Balkanization, 58 Iowa L.R. 576 (1973) criticized the theory even before the Supreme Court first accepted it in *Alexandria Scrap*.

**22.** 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976).

**23.** 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980).

stitutional plan to limit the ability of the States themselves to operate freely in the free market. [447 U.S. at 435] 100 S.Ct. at 2277, citations omitted.

Here Louisiana, unlike South Dakota, does not own any business through which she participates in the industrial construction market.

*White v. Massachusetts Council of Const. Employers* [24] is relied upon heavily by plaintiffs. The City of Boston required that all construction projects in which the City was a signatory to the construction contract have a work force consisting of at least one-half bona fide residents of Boston. An association of contractors mounted a Commerce Clause attack upon the local restriction. The Court approved the requirement under the market participant doctrine. Defendants here argue that Louisiana is funding industrial construction projects, in part, as was the City of Boston. That argument is faulty. First, the Court was careful to point out that although the local policy referred to "projects funded in whole or in part by the City", the only projects before the Court were those "funded wholly with city funds and projects funded in part with federal funds." 460 U.S. at 208, 103 S.Ct. at 1045. Second, the city was a signatory to each such contract as the owner, leading the Court to comment, "Everyone affected by the order is, in a substantial if informal sense, 'working for the city.' " id., 460 U.S. at 210 n. 7, 103 S.Ct. at 1046 n. 7.

■ The *White* case does not support the position of defendants. Louisiana is neither the owner nor the contractor on any industrial plant construction projects affected by Rule One. The state policy simply discriminates against interstate commerce in favor of Louisiana suppliers and labor. Neither the plant owners, the plaintiff contractors nor the contractors' employees can be said in any sense to be "working for the state."

An Alaska local preference was considered in *South Central Timber Development, Inc. v. Wunnicke.* [25] The requirement was that all timber taken from state owned lands must be

processed within the state prior to export. Plaintiff was an Alaska corporation engaged in the interstate timber business and argued that the requirement violated the negative implications of the Commerce Clause. A majority of the court agreed. Justice White, speaking for a plurality, rejected Alaska's market participant argument that since it was selling its own timber, it was simply granting a subsidy to local residents:

> ... Alaska ... participates in the timber market, but imposes conditions downstream in the timber-processing market. Alaska is not merely subsidizing local timber processing in an amount 'roughly equal to the difference between the price the timber would fetch in the absence of such a requirement and the amount the state actually receives.' If the State directly subsidized the timber processing industry by such an amount, the purchaser would retain the option of taking advantage of the subsidy by processing timber in the State or forgoing the benefits of the subsidy and exporting unprocessed timber. Under the Alaska requirement, however, the choice is made for him: if he buys timber from the State he is not free to take the timber out of state prior to processing. [467 U.S. at 94, 104 S.Ct. at 2244 (citations omitted)

Justice White further outlined the doctrine's limits:

> The limit of the market-participant doctrine must be that it allows a state to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The state may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market. id. [467 U.S. at 96, 104 S.Ct.] at 2245.

The defendants argue that the state is financing new construction through tax exemptions. This argument is tenuous at best and a similar argument was rejected by the Supreme Court in *New Energy Co. of*

---

**24.** 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983).

**25.** 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984).

*Indiana v. Limbach.*[26] Ohio claimed that tax exemptions it granted to local producers of ethanol were permissible subsidies. The Supreme Court held that the market participant doctrine did not apply to this program because the state was not involved in the actual purchase or sale of ethanol but rather the state was assessing and computing taxes, which is a "primeval government activity". 486 U.S. at 276, 108 S.Ct. at 1809. Although the Ohio tax credit had the purpose and effect of subsidizing local industry, the state was not a market participant. The state of Louisiana, through the Board of Commerce and Industry is not a market participant in industrial construction.

 The Supreme Court, as noted earlier, has held that a state can respond to market forces and favor its own citizens through subsidies without concern for violating the dormant Commerce Clause.[27] However, tax exemptions are inherently different from subsidies and should be treated differently.[28] Tax exemptions should be treated more like tariffs because of the manner in which they effect interstate commerce, and because of the inherent safeguards involved.[29] A subsidy involves the direct transfer of public monies, using funds exacted from the taxpayers while an exemption assists the exempted enterprise passively.[30] Tax laws are generally effective until repealed (although in this case the exemption lasts only five years with a possible five year extension) while subsidies must be renewed and are subject to heightened political visibility.[31] Lastly, in the American mind, tariffs have historically been suspect.[32]

In *Bacchus Imports, Ltd. v. Dias,*[33] the Supreme Court struck down Hawaii's program of exempting certain local liquor producers from a statewide liquor tax. The Court found that the tax exemption was similar to a tariff on imported liquors and had a discriminatory effect on interstate commerce.[34]

Logically, the amount of a subsidy should in some way be related to the cost of using local labor or materials as opposed to those from out of state.[35] The court in *Wunnicke*[36] was influenced by the fact that the buyer of the timber was not given the choice of taking the subsidy and processing the timber in Alaska, or processing the timber outside of the state and losing the subsidy. The buyer should pay a comparable amount either way because the subsidy would be correlative to the savings from using out-of-state facilities. As in *Wunnicke,*[37] the plaintiffs in this case have no choice economically. Using out-of-state labor in Louisiana will result in the contractor's contractual liability in the amount of the lost or reduced tax exemption.[38]

The latest case from the Supreme Court dealing with subsidies and the dormant Commerce Clause is *West Lynn Creamery, Inc.*

**26.** 486 U.S. 269, 277, 108 S.Ct. 1803, 1809, 100 L.Ed.2d 302 (1988).

**27.** *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976).

**28.** *Coenen, Untangling the Market–Participant Exemption to the Dormant Commerce Clause,* 88 Mich.L.R. 395, 479.

**29.** Id at 479.

**30.** Id at 479.

**31.** Id at 479.

**32.** Id at 479.

**33.** 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984).

**34.** *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049.

**35.** *South–Central Timber Development v. Wunnicke,* 467 U.S. 82, 94, 104 S.Ct. 2237, 2244, 81 L.Ed.2d 71 (1984).

**36.** *South–Central Timber Development v. Wunnicke,* 467 U.S. at 94, 104 S.Ct. at 2244.

**37.** *South–Central Timber Development v. Wunnicke,* 467 U.S. at 94, 104 S.Ct. at 2244.

**38.** Although not particularly persuasive because of the theoretical differences, it is noteworthy that the Supreme Court distinguishes tax exemptions from subsidies for establishment clause purposes. See *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 34, 109 S.Ct. 890, 910, 103 L.Ed.2d 1 (Scalia, J. dissenting).

*v. Healy.*[39] Massachusetts had levied a tax on all milk sold to retailers in the state which funded subsidies to Massachusetts milk producers. The tax was uniformly applied to all milk "dealers" but all the taxes collected were given to Massachusetts dairy producers as subsidies. The result of this program was essentially to tax only out-of-state milk producers. The court found that this plan violated the dormant commerce clause, and reiterated the rule that "a state may not benefit in-state economic interests by burdening out-of-state competitors."[40]

In declaring the program unconstitutional, the Supreme Court rejected four arguments. Massachusetts first argued that since both the tax and the subsidy were individually constitutional, their combination must also be constitutional. The Court rejected this argument and noted that coupling the tax with a subsidy eliminated an important justification for allowing the taxes. Typically, in-state taxed persons will hold the legislature accountable. Where the tax is coupled with a subsidy benefitting these persons, there will be no incentive for them to scrutinize the legislature's actions.[41]

The second argument made by the state was that the Massachusetts farmers who received the subsidy were not in competition with the milk dealers who paid the tax. The Court did not find this argument persuasive, saying "the imposition of a different burden on any part of the stream of commerce . . . is invalid."[42]

The state's third argument was that the pricing order should be allowed because Massachusetts consumers and taxpayers completely carried the weight of the subsidy. The Court found that it was interstate commerce which ultimately paid the price for this program.[43]

The state's last argument was that the burden on interstate commerce was outweighed by local benefits. The court simply responded that preservation of a local industry by protecting it from out-of-state competition is exactly the type of behavior the Commerce Clause forbids.[44,45]

There certainly can be no constitutional objection to Louisiana's granting of a tax exemption or tax reduction to those who construct manufacturing plants within the state's borders. In this court's view, however, it may not condition the tax exemption carrot upon discrimination against interstate commerce. Rule One of Louisiana's tax exemption program, as administered by the defendants, illustrates one of the purposes of the Founders in including the Commerce Clause: it was designed to avoid "the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation."[46] As such, Rule One mandates discrimination upon interstate commerce and thus must yield to the Commerce Clause of the Constitution.

Judgment will be entered in favor of the plaintiffs.

39. — U.S. —, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994).

40. *West Lynn Creamery, Inc. v. Healy,* — U.S. at ——, 114 S.Ct. at 2214.

41. *West Lynn Creamery, Inc. v. Healy,* 114 S.Ct. at 2215.

42. *West Lynn Creamery, Inc. v. Healy,* 114 S.Ct. at 2216.

43. *West Lynn Creamery, Inc. v. Healy,* 114 S.Ct. at 2216.

44. *West Lynn Creamery, Inc. v. Healy,* 114 S.Ct. at 2217.

45. The fact that both West Lynn and Bacchus dealt with a new tax directed towards a particular policy as opposed to a pre-existing, neutral tax is ultimately irrelevant. The purpose and parameters of the tax itself cannot save a facially unconstitutional program of tax exemptions which burden interstate commerce.

46. *Oklahoma Tax Com'n v. Jefferson Lines, Inc.,* — U.S. —, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995).